### STATE v. GRIFFIN.

It is a valid exercise of the police power to prohibit the deposit of sawdust in a lake used as a public water supply and in its tributaries, when such deposit has a tendency to render the water unwholesome for drinking purposes.

Such a statute is not unconstitutional for the reason that it is local in its operation, nor because it prevents the lessee of a mill located upon a tributary of the lake from depositing sawdust therein, contrary to the practice of more than a hundred years.

APPEAL, by the defendant, from the sentence of a magistrate upon a complaint for depositing sawdust in Sucker brook, a tributary of Lake Massabesic. Facts agreed. Lake Massabesic is the source of the water supply of the city of Manchester. There are several sawmills on or near the shore of the lake, all of which deposit sawdust in the water of the lake or of its tributaries. The effect of sawdust on the water is to give it a taste of wood and to discolor it. As the process of decay goes on the effect is to render the water unwholesome for drinking; but the water used in Manchester is taken from the lower end of the lake, and the effect of the sawdust cannot now be detected, except by chemical analysis.

In 1881 the city of Manchester became the owner of a sawmill on Sucker brook, which had existed and been operated for more than a hundred years. During all that period the sawdust created by it was deposited in the brook. Immediately after acquiring the title, the city leased the sawmill for twenty years

to G. In the lease the city agreed that the lessee might " oc-
cupy said premises during said term peaceably and free from
the lawful claims of any persons claiming by, from, or under
said lessor "; and G. covenanted, among other things, that he
would " not carry on, or suffer to be carried on, upon said
premises, any trade, business, or occupation whereby or by rea-
son of which the waters of the aforesaid brook shall be polluted
or affected in any other or different ways from what they now
are or heretofore have been." G. assigned the lease to the de-
fendant, who has ever since operated the sawmill and deposited
the sawdust in the brook.

*Drury & Peaslee,* for the state.

I. Was the city estopped by its covenant for quiet enjoy-
ment? We assume that the argument on this question will be
that, having agreed with Griffin that he shall have peaceable
possession of the property in question, the city cannot, either
directly by municipal ordinance or indirectly by taking advan-
tage of a legislative enactment, disturb this possession. Both
positions are untenable. The act in question was an exercise
of the police power, and it is the rule of law that no state or
municipality can make a binding contract not to exercise this
power. *Church* v. *Mayor,* 5 Cow. 538 ; *Coates* v. *Mayor,* 7 Cow.
585 ; *Goszler* v. *Georgetown,* 6 Wheat. 593, 597, 598 ; 1 Dill.
Mun. Cor., *s.* 98. The doctrine of these cases has recently been
approved by this court. *State* v. *Hayes,* 61 N. H. 264, 331, 332.
The state or city stands as an individual so far as the validity
of contracts is concerned, while its legislative power is entirely
distinct from its contractual obligations. *Church* v. *Mayor,*
*supra.* This rule is the legitimate deduction from the principles
which govern the whole question of the exercise of police power,
" which power is the mere application to the whole community
of the maxim ' *sic utere tuo, ut alienum non lœdas.*' " *State* v.
*Wheeler,* 44 N. J. Law 88, 91.

The case at bar is stronger against the respondent than those
cited. The statute now in question was passed by the legisla-
ture, while the contract was between the municipality and the
respondent. Clearly, then, the question is that of the effect a
statute may have on contracts previously made between indi-
viduals ; and on this question the law is that if a covenant,
lawful when made, is subsequently made unlawful by statute,
the obligor is thereby discharged. *Kincaid's Appeal,* 66 Pa. St.
411. If " the condition becomes impossible by act of God, or
of the law, or of the obligee, etc., then the obligation, etc., is
saved." Co. Lit. 206 a.

II. Was the statute, in its nature and general purpose, a valid

exercise of the police power of the state? This power, extending as it does to the regulation of all matters touching the public health, is properly exercised whenever a statute is enacted calculated to promote that end. It is said to include "health laws of every description. . . . And these are or may be sometimes carried to the extent of ordering the destruction of private property when infected with disease or otherwise dangerous." Cool. Con. Lim. 722. It "extends to the protection of the lives, health, comfort, and quiet of all persons, and the protection of all property within the state; and persons and property are subject to such restraints and burdens as are reasonably necessary to secure the general comfort, health, and prosperity." *State* v. *White,* 64 N. H. 48, 50. Under this power, cemeteries in the thickly settled portions of cities may be prohibited (*Church* v. *Mayor, Coates* v. *Mayor, supra*); and, going still further, the removal by municipal authorities of bodies already lawfully interred may be authorized. *Craig* v. *Church,* 88 Pa. St. 42; *Sohier* v. *Church,* 109 Mass. 1, 21, 22; *Kincaid's Appeal,* 66 Pa. St. 411. In the last named case *Sharswood,* J., says: "Every right, from an absolute ownership down to a mere easement, is purchased and held subject to the restriction that it shall be so exercised as not to injure others. Though at the time it may be remote and inoffensive, the purchaser is bound to know, at his peril, that it may become otherwise, by the residence of many people in its vicinity, and that it must yield to laws for the suppression of nuisances. If conditions or covenants, appropriating land to some particular use, could prevent the legislature from afterward declaring that use unlawful, legislative powers necessary to the comfort and preservation of populous communities might be frittered away into perfect insignificance. If a man were to purchase a building upon condition that it should only be used for the storing of gunpowder,—though perfectly lawful at the time,—if the legislature made it unlawful his property would become valueless; yet it would hardly be pretended that he would have any right to compensation as for property taken for public use."

A statute prohibiting the putting of anything injurious to health into any stream tributary to any reservoir, the source of any public water supply, was held to be constitutional. "The object of this legislation is to protect the public comfort and health. For that purpose the legislature may restrain any use of private property which tends to the injury of those public interests. That the pollution of the source of the public water supply does so tend, no one will deny." *State* v. *Wheeler,* 44 N. J. Law 88, 92.

The question whether acts injurious to the public health shall be prohibited is wholly one for the legislature. Tied. Lim. Pol. Pow.

426; *State* v. *Campbell*, 64 N. H. 402, 403, 404; *State* v. *Marshall,* 64 N. H. 549, 550; *Sohier* v. *Church, supra.* If the prohibited acts or use of property may injure the public health, then the statute is constitutional. "Nor is there anything to render such legislation objectionable because in some instances it may restrain the profitable use of private property, when such use does not in fact directly injure the public in comfort or health. For to limit such legislation to cases where actual injury has occurred, would be to deprive it of its most effective force. Its design is preventive, and to be effective it must be able to restrain acts which tend to produce public injury." *State* v. *Wheeler, supra.* The only question for the court is whether the prohibited acts were of such a nature that they might injure the public health. If they were, the statute was within the scope of the legislative power. Every reasonable doubt must be removed before the court can answer this question in the negative. "It is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other." *Fletcher* v. *Peck*, 6 Cranch 87, 128; *State* v. *Marshall, supra.*

On this question the finding of the case is conclusive. This lake is the source of the water supply of a large city. The facts that the effect of sawdust is, in time, to make the water unwholesome for drinking, and that it has already been put into the lake in such quantities as to affect a body of water covering about 2,500 acres, must make a case for legislative action. The constantly increasing deposit of sawdust, coming first from the old up-and-down saw run by water power, and later from the modern steam mill reinforced by the shingle mill across the stream, was a growing menace to the health of the more than forty thousand people who must drink the polluted water. What if the effect of its presence could only be detected by chemical analysis? It is a matter of common knowledge that people often go on drinking water supposed to be pure until a typhoid epidemic breaks out, and a chemical test reveals the fact that the germs of disease came from the water. The gravest danger from this contamination lies in its insidious character. Before people have any warning disease is spread among them. To remove or arrest the admitted cause of such possible calamity must surely be a reasonable exercise of the protective power of the legislature. Whether this injury was so serious as to require the passage of this statute, whether the facts were such as to make it just that the few mill owners should cease certain injurious operations for the benefit of the many who must drink the lake water, were "legislative, not judicial questions."

In this connection we call attention to the general law of the state on this subject: "If any person shall place, leave, or cause to be placed or left in or near a lake, pond, reservoir, or stream tributary thereto, from which the water supply for domestic purposes of a city, town, or village is taken, in whole or in part, any substance or fluid that may cause the water thereof to become impure or unfit for such purposes, he shall be fined," etc. P. S., c. 108, s. 13. While there has been no decision on the constitutionality of this statute, yet it has stood unchallenged as the law of this state for eight years, and was reported with approval by the commissioners who revised the laws for the Public Statutes. We do not apprehend that counsel would seriously question the validity of this act. But a decision that the act of 1891 is in excess of the legislative power necessarily involves the same conclusion as to the provision of the Public Statutes quoted above. The general law is aimed at "any substance" that "may cause" impurity or even unfitness for domestic use. The special act relates to one substance which not only may have but already has had the effect sought to be prevented by these acts.

We especially call attention to the case of *State* v. *Wheeler*, before cited. The statute passed upon was the same in all essential parts as our own, the case was fully considered, and is, so far as we have been able to ascertain, the only authority on the exact question involved in the case at bar.

*Oliver E. Branch*, for the defendant.

I. Griffin's mill privilege on the brook was a species of property. He used the stream for manufacturing purposes. That use constituted a property or right, for, in its final analysis, it is the use only of what one possesses that constitutes his property in it. *Eaton* v. *Railroad*, 51 N. H. 504, 511. One use to which Griffin put the stream was to turn his mill wheel. That was a lawful and legitimate use. Another use to which he put it was to carry away the sawdust from his mill. That, too, was a lawful and legitimate use, unless it unnecessarily injured some one else. He used the stream as a motive power to turn his wheel, and as a transporting power to carry off his sawdust, and these uses constituted its value to him, and was the substance of his property rights. If the use of the stream for transporting sawdust ever was unlawful or was a private trespass, it became lawful and the trespass ripened into a substantial right, after an uninterrupted and open use and enjoyment of it by him and his predecessors for more than one hundred years. We have, then, these facts: First. The statute deprives Griffin of a valuable piece of property. It does so in defiance of a contract which

his assignor had entered into in good faith with the city, under which, in consideration of his continued right to use the stream for mill purposes, he conveyed the land for flowage to the city for forty years, and the fee simple absolute thereafter. It does so by making it unlawful for him to use his property in a way which does not harm any one, does not constitute a nuisance, and is not detrimental to the public health. We therefore say that the statute is unconstitutional.

II. The contract of the defendant's assignor with the city gave him the right to use the brook in the same way that it had theretofore been used, which included the right to throw sawdust into it. If it afterward became necessary to appropriate those contract rights, undoubtedly legislative authority to do so, upon awarding just compensation, would be sustained. Or, if the use of those rights constitutes a public nuisance, under an equal and uniform rule of law the nuisance might be abated in appropriate proceedings; but this proceeding was not instituted for the purpose of acquiring the property for the public use upon awarding reasonable compensation, and its use by Griffin is not found to constitute, in fact, a nuisance; so that the real, substantial, and actual effect and purpose of the statute is to destroy the contract, and *pro tanto* its value to Griffin, and enable the city to avoid its covenants under it. The legislature cannot transmute the real into the unreal, nor transform fictions into facts. If it attempts to do so, its action may be investigated by the courts. Thus, if it should declare that to be a public use which in its nature was private, its declaration on that point may be set aside by the court. *Concord Railroad* v. *Greely*, 17 N. H. 47. If the legislature should declare that a stream shall be considered a public highway, yet, if in fact it is not one, the legislative declaration that it is so cannot make it so, since, if it is private property, the legislature cannot appropriate it to a public use without providing for compensation. Cool. Con. Lim. 691; *Coe* v. *Schultz*, 47 Barb. 64; *Matter of Cheeseborough*, 78 N. Y. 232.

III. This statute cannot be sustained unless it was passed by the legislature in the exercise of its police power. But the police powers of the legislature are not without limitations, and in the exercise of them the legislature must move within constitutional limitations. *Matter of Jacobs*, 98 N. Y. 98; *Watertown* v. *Mayo*, 109 Mass. 315; *Slaughter House Cases*, 16 Wall. 36.

In *Opinion of the Justices*, 66 N. H. 629, 634, the court said: "Confiscation, either total or partial, not being law in the constitutional sense, is not authorized by the supremacy of the senate and house in the field of legislation, or by the supremacy of other branches of government in the interpretation, admin-

istration, and execution of law." It follows that however sweeping the powers of legislatures are in respect to the exercise of the police power, the courts are not concluded from determining whether a statute, ostensibly passed in the exercise of that power, is a reasonable rule, made necessary for the protection of the health, safety, or convenience of society, or whether, under color of it, personal rights, liberty, and property of a citizen are invaded without compensation. We therefore say ·that, upon the facts as they appear here, the first section of this statute, under which this prosecution was instituted, cannot be upheld. The effect of it is not to protect the people of Manchester from dangers arising from the deposit of sawdust in the lake or its tributaries, because no such danger exists; and it simply results, without any advantage to the public, in depriving the defendant of the use and enjoyment of his property, in the confiscation of his contract rights, and in the destruction of his business.

IV. The statute is unconstitutional in that it is not an equal and uniform law of the state. It does not apply to all its citizens similarly situated. It operates against a class only, and to those engaged in a particular occupation in a part only of the state. It is not necessary here to say anything in support of the proposition that in New Hampshire the law cannot discriminate in favor of one citizen to the detriment of another. The principle of equality pervades the entire constitution. *State* v. *Pennoyer*, 65 N. H. 113, 114. "An act which operates on the rights or property of only a few individuals without their consent is a violation of the equality of privileges guaranteed to every subject." *Ib.* 115.

"Every one has a right to demand that he be governed by general rules, and a special statute which, without his consent, singles his case out as one to be regulated by a different law from that which is applied in all similar cases, would not be legitimate legislation, but would be such an arbitrary mandate as is not within the province of free governments." Cool. Con. Lim. (6th ed.) 483; *Millett* v. *People*, 117 Ill. 294.

In *Matter of Jacobs*, *supra*, it was held that the act in question was unconstitutional, among other reasons, for that it applied only to cities in the state having a population of 500,000, and that, therefore, the statute which made it a criminal offence to manufacture cigars in tenement houses in cities of that class, whereas it was perfectly lawful outside those cities, was in violation of a principle of equality. So, too, in *People* v. *Marx*, 99 N. Y. 377, which was an indictment under a statute prohibiting the manufacture of oleomargarine which was not sold in a way to deceive the public, the court held that the statute was unconstitutional.

If the legislature should pass a statute providing that physicians in Hillsborough county should not practice their profession unless licensed to do so by some governing board, it could not be sustained, however desirable it may be that only the best physicians should practice in Hillsborough county.   This statute is just as unequal and partial in its operation and effect.   Mill owners upon the streams tributary to any other water supply within the state are at liberty to pursue their calling and exercise their ancient rights unmolested.   It is conceivable that there is a mill owner on a stream upon the opposite side of the watershed from that which supplies Lake Massabesic, whose mill is in sight of the defendant's, and that the sawdust from his mill is actually injurious to the health of some other municipality; and yet he and every other citizen of the state, except those on Lake Massabesic and its tributaries, engaged in the lumber business, is protected in the enjoyment of his rights and in the pursuit of his occupation by the laws and constitution of the state, whereas this defendant, in pursuing the same calling and similarly situated, is deprived of his property, his business, and his means of obtaining a livelihood, by an arbitrary act of the legislature which makes it a criminal offence for him to do so.   Such a law violates the principle of equality inherent in the constitution of New Hampshire, impairs the obligation of the contract which the city entered into, by means of which they obtained his farm, and appropriates it to a public use without compensation.   If it becomes necessary for the city to obtain the exclusive use and occupation of land surrounding the lake or its tributaries for the purpose of preventing the pollution of its water supply, ample authority to do so is given to it in the second section of this act, without injury to the rights of any one.   It should not be permitted to accomplish indirectly the same result by criminal proceedings instituted under the provisions of section 1.

The effect of this statute is to take from Griffin the consideration for which his farm was sold to the city.   This amounts to depriving him of his farm without consideration.   It directly deprives him of the beneficial use and enjoyment of his property.   This is a taking of his property within the meaning of the constitution.   A man's property may be taken within the meaning of the constitution, although his title and possession remain undisturbed.   To deprive him of the ordinary beneficial use and enjoyment of his property is, in law, equivalent to the taking of it, and is as much a taking as though the property itself were actually taken.   Lew. Em. Dom., *s.* 56; Tied. Lim. Pol. Pow. 397; Cool. Con. Lim. 670; *Eaton* v. *Railroad,* 51 N. H. 504; *Vanderlip* v. *Grand Rapids,* 73 Mich. 522; *Smith* v. *Rochester,* 92 N. Y. 463.

If the taking of property becomes necessary, compensation

must be awarded; and if the use of it constitutes in fact a nuisance, that fact must be found as any other fact is found which affects a man's liberty or property. It cannot be established by a mere legislative fiat. The city's contract with Griffin that he might use his mill privilege as he had previously cannot be evaded, avoided, or rescinded without his consent, by a private act of the legislature which the city procures to be passed. The question of the motive of the legislature in passing the act does not arise, but the question of the effect of the act does arise, as also whether it were a constitutional exercise of legislative authority. The motive of the city in procuring the passage of the act becomes important in determining whether the act was in fact an exercise of police power, or was passed to avoid the payment of land damages to riparian proprietors for land condemned for public use.

The validity of P. S., *c.* 108, *s.* 13, relating to the prevention of nuisances, does not arise, because this prosecution was not brought under it, and it differs materially from the act in question. That statute is a general law, applicable to all persons in the state, and the issues raised in prosecutions under it are, did the respondent put sawdust in the water and did that render the water "impure or unfit" for "domestic purposes"? Under this statute the only question open for the respondent is, did he put sawdust in the lake or tributary? Whether it rendered the water impure or unfit for domestic use cannot be inquired into. The general law makes the question of reasonable use (that is, whether the water has or has not been rendered impure or unfit for domestic use) one of fact. This statute decides it by an arbitrary *dictum* of the legislature.

It is immaterial that Lake Massabesic is one of the great ponds of the state. The defendant was not convicted of throwing sawdust into that lake, but of throwing it into the brook, the soil underneath which was the private property of his assignor, and the use of which he held under lease from the city. If his mill privilege were situated on the lake itself, his property right to its reasonable use would still exist. *Concord Co.* v. *Robertson*, 66 N. H. 1. Nor need the defendant claim his right to the use of the lake for the purpose of carrying away his sawdust by prescription. The rights of the public to the use of public waters are not limited to fishing and navigation. They are "held for the use and benefit of all subjects, for all useful purposes, the principal of which were navigation and fisheries." *Ib.* 8, 18, 19, 22, 29.

The use of the brook and of the lake itself, for the purpose of sawing lumber and disposing of the sawdust, were property rights which Griffin had, subject only to the restriction of reasonable use. What is reasonable is a question of fact, whether the

water is private or public, and is one of fact for the jury. *Hayes* v. *Waldron*, 44 N. H. 580 ; *Green* v. *Gilbert*, 60 N. H. 144.

*Drury & Peaslee*, for the state.

I. " The duty of protecting its citizens is one of which the state cannot divest itself." *State* v. *Forcier*, 65 N. H. 42. " All agree that the legislature cannot bargain away the police power of the state. . . . No legislature can curtail the power of its successors to make such laws as they may deem proper in matters of police. Many attempts have been made in this court and elsewhere to define the police power, but never with entire success. . . . No one denies, however, that it extends to all matters affecting the public health or the public morals. . . . No legislature can bargain away the public health or the public morals. The people themselves cannot do it, much less their servants. The supervision of both these subjects of governmental power is continuing in its nature, and they are to be dealt with as the special exigencies of the moment may require. Government is organized with a view to their preservation, and cannot divest itself of the power to provide for them. For this purpose the largest legislative discretion is allowed, and the discretion cannot be parted with any more than the power itself. . . . The power of governing is a trust committed by the people to the government, no part of which can be granted away." *Stone* v. *Mississippi*, 101 U. S. 814, 817, 818, 819, 820. To the same effect: *Boston Beer Co.* v. *Massachusetts*, 97 U. S. 25 ; *Stuyvesant* v. *Mayor*, 7 Cow. 588, 604 ; *People* v. *Squire*, 107 N. Y. 593, 604. It is often the effect of the exercise of the police power that it practically destroys the value of property by restricting its use. *Mugler* v. *Kansas*, 123 U. S. 623. Such limitation of use is not a taking. *Commonwealth* v. *Alger*, 7 Cush. 53, 85, 86 ; *State* v. *Wheeler*, 44 N. J. Law 88, 91, 92.

II. The police power extends not only to the abatement of that which has already become a nuisance, but also to the prohibition of acts which may become such. *Watertown* v. *Mayo*, 109 Mass. 315 ; *State* v. *Wheeler, supra.* The findings in the case at bar bring it far inside this rule, for it is found that " The effect of sawdust on the water is to give it a taste of wood and also to discolor it. As the process of decay goes on, the effect is to render the water unwholesome for drinking. . . . The respondent did throw sawdust into the brook." Chemical analysis is necessary to detect the effect of the sawdust which has been placed in the lake. The finding that the effect of decaying sawdust is to make the water unwholesome is alone sufficient to show cause for legislative interference. It is gravely argued that as chemical analysis alone can detect the injurious effect of

sawdust, as the water "looks well" and has not as yet caused an epidemic, therefore this court can say to the legislature that it has no power to prevent further contamination. Until this objection was insisted upon in oral argument, we had supposed that New Hampshire was sufficiently advanced in elementary sanitary learning to consider that it might be a legitimate exercise of the power to control individual action for the public good to prohibit the doing of acts the injurious effects of which were not obvious to the sense of sight, touch, smell, or taste. Smallpox patients are isolated, not because there is any danger apparent to the sense of the average man, but because scientific men have learned that the air around them is filled with the germs of disease. The sale of intoxicating liquor is prohibited, not because the sight of it is repulsive, the smell offensive, or the taste disagreeable, but because we learn that its use may be injurious. The argument that as the contamination is not increasing at a rapid and easily perceptible rate, therefore it should be permitted to continue, would be a proper one to urge before the legislature as a reason why it should not interfere, but it has no place here.

The question here is substantially the same as that on a motion for a nonsuit. Is there evidence in the case from which one might find that this is a nuisance? If there is, that is the end of this objection, for beyond this the court cannot go in its oversight of legislative action any more than it can in its control of verdicts of juries. "It cannot run a race of opinions upon points of right, reason, and expediency with the law-making power." Cool. Con. Lim. (5th ed.) 201. Suppose the court should hold that for the reason that no harm has as yet come from the defendant's acts, the statute is unconstitutional. What is the result? The Public Statutes provide a penalty for putting in or near the source of any water supply any substance that may cause the water thereof to become impure. This statute, being preventive in its nature, must also be held to be unconstitutional. And this is true of the bulk of legislative exercise of police power. As was said in *State* v. *Wheeler, supra,* "its design is preventive"; and most of the statutes passed by virtue of its authority are aimed at those things which are not yet nuisances, but would become such if permitted to continue. "A reasonable measure of prevention in relation to gunpowder (G. S., *c.* 98), or combustible and dangerous buildings (G. S., *c.* 96, *ss.* 19, 20), is authorized, as well as the law of arson. . . . And that protection need not be confined to a penalty for actual disturbance. The danger may be dealt with as the danger of disease is averted, by quarantine regulations." *State* v. *Cate,* 58 N. H. 240, 241.

III. "Laws public in their object may, unless express con-

stitutional provision forbids, be either general or local in their application. . . . The authority that legislates for the state at large must determine whether particular rules shall extend to the whole state and all its citizens, or, on the other hand, to a subdivision of the state or a single class of its citizens only. The circumstances of a particular locality, or the prevailing public sentiment in that section of the state, may require, or make acceptable, different police regulations from those demanded in another. . . . These discriminations are made constantly; and the fact that the laws are of local or special operation only is not supposed to render them obnoxious in principle. . . . If the laws be otherwise unobjectionable, all that can be required in these cases is, that they be general in their application to the class or locality to which they apply; and they are then public in character, and of their propriety and policy the legislature must judge." Cool. Con. Lim. (6th ed.) 479, 480, 481.

An act authorizing recovery for injuries to lands along two specified creeks was held to be constitutional. " Neither do we think the act is open to any constitutional objection, on the ground, taken in argument, that it is a partial, if not a personal, remedy given to this plaintiff and certain other citizens, to the exclusion of all others, and against these defendants only. The remedy is given to all who are liable to the mischief, and against those only who can do the injury. It is a remedy given to any and every one who is an owner of land lying on the White Clay creek, or Red Clay creek, for injuries done to such land by the unlawful acts of the company. *Bailey* v. *Railroad*, 4 Harr. 389. An act providing a special method for appointing surveyors of lumber for Penobscot county, when there was a general law applicable to the state at large, was held to be constitutional. We call especial attention to this case, as it reviews many similar decisions. " The legislatures of Massachusetts and this state have repeatedly recognized the distinction between such resolves, granting personal privileges or exemptions to certain individuals by name, and laws of a local character of the kind before mentioned in this opinion. The former are considered unconstitutional; the latter are not so considered." *Pierce* v. *Kimball*, 9 Greenl. 54, 59. " The legislature may constitutionally pass a general law in relation to a particular place. *Scott* v. *Willson*, 3 N. H. 321; *State* v. *Noyes*, 30 N. H. 279." *Charter of Manchester*, 47 N. H. 277, 279. A law regulating fishing in one bay of Lake Ontario was held to be constitutional. *Lawton* v. *Steele*, 152 U. S. 133. The same result was reached in the consideration of a local betterment law. *Walston* v. *Nevin*, 128 U. S. 578. The legislature may apply like laws to all common carriers, or to railways only. *Missouri, etc., R'y* v. *Mackey*, 127 U. S. 205. To the same general effect as the foregoing are

the following: *Marchant* v. *Railroad,* 153 U. S. 380, 389; *People* v. *Squire,* 107 N. Y. 593, 601; *Watertown* v. *Mayo,* 109 Mass. 315, 319.

Comment upon these authorities seems superfluous. They clearly establish the rule that a statute may be local in its application and yet be constitutional if it applies alike to all who may violate its provisions. The act under consideration is of this class. It is not, as claimed in argument, limited to Manchester and Auburn. The statute applies not only " to Lake Massabesic, situated in Manchester and Auburn," but also to " any stream tributary thereto."

At the argument the question was asked if this act was not " aimed at this respondent." An examination of the case will show that " There are several streams tributary to the lake, on which are located a number of sawmills. There are other sawmills on the shore of the lake." So far as appears, others have obeyed the law which this respondent has violated. As he is the only offender, he poses as a martyr when prosecuted for his disregard of the law which others obey. In this view of the case, but in no other, the law is " aimed at this respondent."

*Edwin F. Jones,* for the state.

I. The question whether Griffin has broken the terms of his contract with the city of Manchester is irrelevant and immaterial. It is of no consequence that he ever had a contract with the city. Whatever decision is given as to the constitutionality of the act, must be rendered regardless of the fact that Griffin is the respondent. He is not the only person affected by the act, and the decision must be the same as if some other person who never owned a mill upon the brook in question, and who claimed no right by prescription or grant from any one to deposit sawdust in its waters, but who had deposited sawdust in the stream, were the defendant.

II. The fact that the statute may interfere with some rights of the respondent (whether rights acquired by contract or otherwise can make no difference), without providing compensation to him, does not make the law unconstitutional, provided it was passed in the legitimate exercise of the police power by the legislature. He is presumed to be rewarded by the common benefits secured to large numbers of the citizens of the state. *Watertown* v. *Mayo,* 109 Mass. 315, 319. We ask the careful consideration of this case and claim that as an authority it is conclusive against the respondent's contention. The court say (*p.* 319): " To a great extent the legislature is the proper judge of the necessity for the exercise of this restraining power. It is not easy to prescribe its limit. The law will not allow rights

of property to be invaded under the guise of a police regulation for the preservation of health or protection against a threatened nuisance; and when it appears that such is not the real object and purpose of the regulation, courts will interfere to protect the rights of the citizen. But a perversion of this power is not shown by the fact that the business restrained is a necessary and lawful business, which has not yet become a public nuisance in fact, or been declared to be such by the statute.. The law most wisely interferes for the protection of the public by preventing in advance threatened and · probable injury. Exposure to danger is itself an injury."

Lake Massabesic is the well which furnishes the drinking water for nearly 50,000 people, about one eighth of the population of this state. The water in that well shows the presence of a substance the effect of which, as the process of decay goes on, is to render the water unwholesome for drinking and dangerous to the lives and health of those who use it. What stronger motive could any legislature need to say that the practice of throwing into that lake, or into a stream flowing directly into it, more of the same harmful and injurious substance must cease? Our court sustains laws prohibiting the sale of liquors, harmful mainly in the abuse of them, and so destroying the legitimate business of men engaged in selling them at the time the laws were passed; laws restricting the use of property by regulating the height and material of buildings which can be erected in special localities, and so affecting the value of the property; laws regulating and restricting the sale of substances like oleomargarine and milk, and so depriving the dealers therein of the exercise of their previously lawful calling,— all these with penalties prescribed, and without compensation to those who are inconvenienced. If these are proper exercises of the police power, how much more so must be the prohibition of the future throwing into Lake Massabesic of a substance which has already polluted its waters, and of which the necessary effect of a larger quantity must be to render them unwholesome and unfit for use.

The legislature is ordinarily the proper judge of the necessity for the exercise of the police power; and unless there is something in the case to show that the act was not required for the preservation of health and protection against a nuisance or a threatened nuisance, the law must stand. Laws passed in the exercise of this power are not obnoxious to constitutional provisions merely because they do not furnish compensation to the individual who is inconvenienced by them. *Bancroft* v. *Cambridge*, 126 Mass. 438, 441. Unless the court is satisfied that there was absolutely no need of the law, and that the legislature was wholly mistaken or deceived as to the facts on which the

necessity of the law was founded, the law must stand. Courts will not declare a statute void, as being contrary to the constitution, unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt. *Rich* v. *Flanders*, 39 N. H. 304; *Orr* v. *Quimby*, 54 N. H. 590, 601.

III. The law is not unconstitutional in that it is not an equal and uniform law of the state, for it applies to all citizens alike who act in the same way Griffin has acted in throwing sawdust into the waters of the brook or lake. It is not limited in its operation on those engaged in any particular occupation. It is a general law, binding upon all inhabitants of New Hampshire. It cannot be objected to as not extending to all persons, but it is objected to as not extending to all places. We submit that it is a general law in relation to a particular place. The legislature have the right to pass such a law. *Scott* v. *Willson*, 3 N. H. 321, 328. The decision in that case has stood as the law in this class of cases since 1825, unchallenged and unquestioned. Police regulations need not be applicable to all parts of the state. *Watertown* v. *Mayo, supra; State* v. *Noyes*, 30 N. H. 279.

We call attention to the large number of similar laws which have been passed by the legislature regarding special localities (which have been acquiesced in by every one and objected to by none), such as laws prohibiting the catching of fish in a particular pond or stream; making it an offence to interfere with the operation of the cars of a horse railroad in some particular city; prohibiting bathing or driving on the ice in Willand pond,— all penal statutes like that under consideration. The general consent and obedience to such laws for many years may properly be considered in determining the validity of a similar law. If there was anything in such an objection, it is fair to presume that some of the able lawyers and judges of our state in the past would have suggested it.

IV. The respondent objects to the law because the use of the waters of the brook to carry off the sawdust is not found to constitute in fact a nuisance, or is not left to be found as such a fact by a jury, but is made illegal by a mere legislative fiat. In other words, his objection is that the law is forbidden by the constitution because it undertakes to determine questions of fact and law, and is judicial in its character. But the legislature do not exceed their legitimate authority when they make a change of the law and constitute that act an offence which was not such before, nor when they make certain acts an offence of a particular kind within which they were not previously included. The validity of such legislation must be sustained. *State* v. *Noyes*, 30 N. H. 279, 294.

In conclusion, we submit that if the objections raised by this respondent prevail, it will be impossible for the legislature to

ever exercise the police power. To enact that certain acts shall not in the future be performed under penalty presupposes that some one has heretofore performed a similar act, and the effect of all restraining legislation is to deprive some one of the right to do what he has been in the habit of doing. If his inconvenience or actual injury is to govern the interpretation of the law, then in very few cases can any new penal statute be sustained. We submit that the good of the great number in such cases must be considered, and that the authorities cited in this and former briefs are conclusive in that view; and that the small injury done to Griffin by depriving him of the privilege of throwing sawdust into the brook, whether he has legal right or not to do so, when he might easily dispose of it in some other way, ought not to be considered as of greater weight than the lives and the health of the thousands of people who live in Manchester and drink the water of the lake.

*Oliver E. Branch,* for the defendant.

I. I desire to emphasize the constitutional objections which seem to exist against the statute under which the defendant was arrested. The first objection to it is that it subverts the principle of equality which is inherent in the constitution of New Hampshire, and which, broadly and generally speaking, is designed to protect every citizen in the enjoyment of his life, liberty, and property. The supreme court of this state early expounded the doctrine of the constitutional equality of rights and privileges to every citizen of New Hampshire. *Merrill* v. *Sherburne,* 1 N. H. 199. It has in several instances passed upon the validity of the statutes in which that principle was violated. It has established the proposition that the chief end sought by the constitution was to secure to all as perfect equality of privilege and of burden as human wisdom permits, and that to this all other purposes were incidental and subordinate. *State* v. *Pennoyer,* 65 N. H. 113. It has declared that whenever an act of the legislature in any way deprives one of equality of right, privilege, or immunity touching any matter affecting the enjoyment of his life, liberty, or property, it violates the great fundamental principle of the constitution; and such legislation is condemned whether it is applicable to a single individual or to a number. Thus, in *State* v. *Pennoyer,* an act of the legislature required that physicians who had not resided continuously in the state from the first day of January, 1875, to the date of the act, should obtain a license to practice, while physicians who had resided continuously within the state during that period were exempt. The statute was declared unconstitutional for the reason that it imposed a burden upon one class of citizens which was not imposed upon another class similarly situated.

In *People* v. *Gillson*, 109 N. Y. 389, the court, referring to the constitutional provision that no person shall be deprived of life, liberty, or property without due process of law, said: " A person living under our constitution has the right to adopt and follow such lawful industrial pursuit, not injurious to the community, as he may see fit. The term 'liberty,' as used in the constitution, is not dwarfed into mere freedom from physical restraint of the person of the citizen, as by incarceration, but is deemed to embrace the right of man to be free in the enjoyment of the faculties with which he has been endowed by his Creator, subject only to such restraints as are necessary for the common welfare. Liberty, in its broad sense, as understood in this country, means the right not only of freedom from servitude, imprisonment, or restraint, but the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or avocation."

II. Assuming that the throwing of sawdust into any stream or pond which is used as a source of water supply is injurious to the public health, this act, instead of making it a crime or misdemeanor to do so throughout the state, only applies to Lake Massabesic and its tributaries. Suppose the general laws in regard to the prevention and removal of nuisances (P. S., c. 108), which are meant to reach anything and everything detrimental to the public health, had been qualified by the proviso that they should be construed as applying only to the town of Auburn, would not the unconstitutionality of those statutes because they were thus limited, and partial, and special, be readily apparent? Sections 13 and 14 of that chapter provide especially for the protection of lakes, ponds, and reservoirs that are used for water supply, and the board of health in any town, or the water commissioners having charge of a water supply, or the proprietors thereof, are authorized to remove any substance or fluid that may defile water used for domestic purposes, and recover the expense of such removal from the person violating the statute. If, then, this general law in regard to the prevention and removal of nuisances had been qualified in the way suggested, so as to apply only to the town of Auburn, it would result that the citizens of the town of Auburn would be subjected to a species of criminal prosecution or civil action to which no other citizens of the state would be subjected. In that case I apprehend that the unconstitutionality of the statute would be apparent.

The statute in this case is as special as the general law would be if it were qualified in the manner I have supposed. It is applicable only to persons who may throw sawdust into Lake Massabesic or its tributaries; it renders such persons only liable to this particular kind of prosecution; it leaves every citizen of the

state free to throw sawdust into any pond or stream that may be used as a water supply; it singles out Lake Massabesic, which is one of the great ponds of the state, the waters of which belong to all the people for all the uses that are permitted at common law, and makes it an offence to place any quantity of sawdust, great or small, in that lake or any stream tributary thereto, regardless of the question whether such an act constitutes a nuisance. The result is that if the placing of sawdust in Lake Massabesic amounts to a nuisance, the offender is subjected not only to the penalty prescribed by this particular statute, but also to the penalty prescribed by the general laws of the state in regard to the prevention and removal of nuisances; whereas, any one in any other part of the state is subjected to but one penalty if he defiles water used for domestic purposes by putting sawdust in it; or, if his act does not defile it, is subjected to no penalty whatever.

Here, then, we have an act made by statute a crime in one part of the state which is not a crime in all other parts, and a citizen owning land underneath a stream tributary to one of the great ponds of the state, rendered liable to a criminal prosecution for a perfectly harmless and inoffensive use of that tributary ; whereas, all other citizens of the state situated similarly are permitted to do precisely the same thing without punishment. I can make no argument which would make any clearer the inequality of burden which such a statute imposes.

III. The next objection to the statute is that it is an unconstitutional exercise of the police powers of the legislature. What is the police power? It has been defined to be " the right of a state, or of a state functionary, to prescribe regulations for the good order, peace, protection, comfort, and convenience of the community, which do not encroach on the like power vested in congress by the federal constitution." *Gas Light Co.* v. *Hart*, 40 La. An. 474. Blackstone defines public police to be " the due regulation and domestic order of the kingdom, whereby the individuals of the state, like members of a well governed family, are bound to conform their general behavior to the rules of propriety, good neighborhood, and good manners, and to be decent, industrious, and inoffensive in their respective stations." 4 Bl. Com. 162. " The conservation of private rights is attained by the imposition of wholesome restraint upon their exercise ; such a restraint as will prevent the infliction of injury upon others in the enjoyment of them. It involves a provision and means of enforcing the legal maxim which underlies the fundamental rule of both human and natural law : *Sic utere tuo ut alienum non lædas.* The power of the government to impose this restraint is called police power." Tied. Lim. Pol. Pow. 2. The police power of a state extends to the

protection of all property within the state, and hence to the making of all regulations promotive of domestic order, morals, health, and safety. *Hannibal, etc., R. R.* v. *Husen*, 95 U. S. 465.

It is conceded that a power which touches so many diverse and important concerns of organized society must necessarily be wide in its scope and application; and no courts that I am aware of have undertaken to set any definite metes and bounds to its exercise. Thus, in *Stone* v. *Mississippi*, 101 U. S. 814, *Waite*, C. J., said: "Many attempts have been made in this court and elsewhere to define the police power, but never with entire success. It is always easier to determine whether a particular case comes within the general scope of the power than to give an abstract definition of the power itself which will be in all respects accurate."

But while it is said that its exercise is within the discretion of the legislature, this statement must be taken with the qualification that the discretion of the legislature must be exercised within constitutional limitations. The legislature under the guise of exercising police power cannot enact something which is obviously unreasonable and therefore unequal, and which is not plainly necessary for the protection of the lives, limbs, health, comfort, and quiet of the people. If there were no such constitutional limitations surrounding the exercise of police powers of the state, and if the courts were powerless to enforce them, we should be compelled to concede that in a republican form of government, in which there was established a division of powers for the express purpose of preventing oppression and of securing to every man the fullest enjoyment of his life, liberty, and property, there is after all lodged in the legislative department a power capable of development into the most subtle and dangerous form of tyranny. The people of New Hampshire, in the bill of rights, were careful to reserve to themselves all powers and all rights not specifically or by necessary implication granted to the government for the purposes specified. Article II states: "All men have certain natural, essential, and inherent rights, among which are the enjoying and defending life and liberty, acquiring, possessing, and protecting property, and, in a word, of seeking and obtaining happiness." Article III states: "When men enter into a state of society, they surrender up some of their natural rights to that society, in order to insure the protection of others; and without such an equivalent the surrender is void." Obviously it was not the intention of the people of New Hampshire when they organized under a state government, under a written constitution, to confer upon any department of the government the power to destroy the very things which it was their purpose by that constitution and bill of rights effectively to secure to every citizen. They did not intend

that there should be vested in the legislature an undefined, undefinable, limitless, discretionary, irresponsible, and unaccountable power, the exercise of which might destroy the prime purpose for which that government was organized. The legislature cannot, under the pretence of exercising the police power, enact laws prohibiting harmless acts and the prevention of which is not necessary to the health, safety, or welfare of society. And the courts may examine into and annul such illegal legislation.

In *People* v. *Gillson, supra,* it was said (*p.* 401): "It is generally for the legislature to determine what laws and regulations are needed to protect the public health and serve the public comfort and safety, and if its measures are calculated, intended, convenient, or appropriate to accomplish such ends, the exercise of its discretion is not the subject of judicial review. But those measures must have some relation to these ends. Courts must be able to see, upon a perusal of the enactment, that there is some fair, just, and reasonable connection between it and the ends above mentioned."

This is the true test of the validity of an exercise of police power. It must be " fair, just, and reasonable " to secure the proposed end, and the courts will inquire into whether it is fair, just, and reasonable. It is fair, just, and reasonable that the water supply of any municipality within the state should be kept pure, but it is not fair, just, and reasonable in order that this may be done that an unfair, unjust, and unreasonable prohibition should be laid upon any citizen in the use and enjoyment of his property. If the legislature should say that no person should walk across the ice on Lake Massabesic in the winter, nor take fish from it in summer, nor row a boat over it, nor plant corn within ten feet of its banks or of any tributary thereto, I think that such prohibitions would be regarded as unfair, unjust, and unreasonable, and not necessary in order to protect the health of the community. So in this case it is obviously unfair, unjust, and unreasonable to prohibit the deposit of sawdust in the lake, regardless of the fact whether sawdust in any quantity, great or small, is known to be injurious to water. If it is, the fact can be readily determined, and ample provision is made in the general law for the abatement of such a nuisance. To that general law every citizen of the state should be made to conform, and under that general law every municipality should find its protection. But if it is not harmful (and there is no evidence that it is in this case or ever has been), then a special statute which forbids the respondent to use his ancient mill site on the stream on his land for the ordinary purpose for which it has been used for a hundred years in the manufacture of lumber, is a destruction of his property without compensation, a deprivation of it without due process of law, and a tyran-

nical usurpation of authority by the legislature, under a pretence of exercising police power.

There are certain things which the common sense of mankind has recognized as being dangerous when done within the compact parts of a city or town, and which, therefore, are prohibited, such as the carrying on of slaughter houses, powder works, rendering establishments, and the like. There are certain things which the common sense of mankind recognizes should not be permitted, such as keeping of swine or maintaining cesspools and vaults under such circumstances as render them offensive and dangerous. But no one would say that it was fair, just, and reasonable to prohibit all these things absolutely, under all circumstances, and an act of the legislature that undertook to do so would be condemned as unconstitutional, because unreasonable. The common experience of the community has not determined that the deposit of sawdust in the streams and ponds of the state in the manufacture of lumber is obviously liable to injure the health of the people. The case does not show that it does so, and I assume that the court will not assume that it does in the absence of evidence. The most the legislature could do constitutionally is to prohibit the placing of sawdust in the rivers and waters of the state in such quantities as would be dangerous; and that would be a question of fact to be determined by a competent tribunal. It cannot constitutionally make a perfectly harmless occupation harmful, nor add to sawdust any toxic qualities, by statute. If it prohibits those things which are recognized as necessary or fairly demanded, and reasonably calculated to protect the community, its acts will be sustained by the courts; but when, under the plea of so doing, it prohibits lawful occupations and the reasonable, customary, and necessary use of a man's property and privileges, without necessity and without reason, it is doing an unauthorized thing, and the court should so declare it.

IV. The legislature has already provided, in addition to the general statutes in regard to the abatement of nuisances, a remedy for the nuisance of water rights. P. S., c. 205, s. 3. I respectfully suggest that this statute affords an ample remedy for the infringement of any constitutional right, public or private; and that any act of the legislature which undertakes to do more than is embodied in that statute oversteps delegated constitutional powers. It is suggested that this is a general law, applicable only to a portion of the state, and the case of Scott v. Willson, 3 N. H. 321, is cited, in which Richardson, C. J., said that the statute there in question was a general law in relation to a particular place; but I submit that the decision in that case is opposed to the principle established in State v. Pennoyer, supra, and that the decision upon the main question in that case,

whether the act was an act regulating commerce, if it were before the court now would be overruled. I further submit that it is a legal euphemism to say that a law is general which is applicable only to a portion of the state. It is the same thing as saying that a local law is applicable to the whole state. If such is the fact, there is no such thing as a general law as distinguished from a local law. A law is local if it touches a part of the state or a part of its people. If it touches either it is local. *People* v. *Supervisors*, 43 N. Y. 10. A law applying in its practical operation to a limited district of the state is local, unless it relates to a subject affecting the general welfare and interest of the whole state, and not of that district alone. *Matter of De Vancene*, 31 How. Pr. 289.

The principle in this state is that all laws shall affect alike all persons similarly situated, or in like conditions, and it cannot be evaded by saying that it is general because it affects all the people of the state who may happen to come within the scope of its special condition or operation; and no law in New Hampshire is general, equal, and uniform unless, if it be a law relating to. personal rights, it touches alike all persons within the state; and which, if it affects the property rights, affects alike all property of the same kind similarly situated. The statute here in question is special in both its aspects. It affects the personal rights of those only of the people who are brought within the peculiar circumstances which constitute its violation; and it affects the property rights of those only who, before its enactment, could lawfully use the tributaries of Lake Massabesic in carrying on a legitimate industry. If the crimes of murder and perjury were by statute confined to homicides and false swearing done within the county of Hillsborough, could it be argued that it was a general law in the constitutional sense, because it touched all persons in the state who committed those offences within the county of Hillsborough? Is it not absolutely necessary that a general law shall have the same effect everywhere in the state, whether it relates to persons or property?

CARPENTER, C. J. "If any person shall throw, place, leave, or cause to be thrown, placed, or left, any sawdust in Lake Massabesic, situated in Auburn and Manchester, or in any stream tributary thereto, he shall be punished for the first offence by a fine not exceeding twenty dollars, or by imprisonment not exceeding thirty days, or both; and for any subsequent offence by a fine not exceeding one hundred dollars, or by imprisonment not exceeding six months, or both." Laws 1891, *c.* 26, *s.* 1. The complaint is founded upon this statute. The circumstance that the defendant holds the mill under a lease from the city of Manchester and the stipulations of the lease are immaterial. The city cannot exempt the defendant from the operation of

the statute. The only defence is that the act is unconstitutional. The defendant claims that it is in conflict with the constitution for three distinct reasons, namely, because (1) it deprives him of his property without compensation; (2) it is an exercise not of legislative but of judicial power; and (3) it is not an equal and uniform law applicable equally to all persons similarly situated, but operates only against those engaged in a particular business in a particular part of the state.

"It is a settled principle, growing out of the nature of well ordered civil society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use of it may be so regulated that it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community. All property in this commonwealth . . . is derived directly or indirectly from the government, and held subject to those general regulations which are necessary to the common good and general welfare. Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment as shall prevent them from being injurious, and to such reasonable restraints and regulations established by law as the legislature, under the governing and controlling power vested in them by the constitution, may think necessary and expedient.

"This is very different from the right of eminent domain, the right of a government to take and appropriate private property to public use whenever the public exigency requires it, which can be done only on condition of providing a reasonable compensation therefor. The power we allude to is rather the police power, the power vested in the legislature by the constitution to make, ordain, and establish all manner of wholesome and reasonable laws, statutes, and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth and of the subjects of the same.

"It is much easier to perceive and realize the existence and sources of this power than to mark its boundaries or prescribe limits to its exercise. There are many cases in which such a power is exercised by all well ordered governments, and where its fitness is so obvious that all well regulated minds will regard it as reasonable. Such are the laws to prohibit the use of warehouses for the storage of gunpowder near habitations or highways; to restrain the height to which wooden buildings may be erected in populous neighborhoods, and require them to be covered with slate or other incombustible material; to prohibit buildings from being used for hospitals for contagious diseases, or for the carrying on of noxious or offensive trades; to pro-

bibit the raising of a dam and causing stagnant water to spread over meadows near inhabited villages, thereby raising noxious exhalations injurious to health and dangerous to life.

" Nor does the prohibition of such noxious use of property, a prohibition imposed because such use would be injurious to the public, although it may diminish the profits of the owner, make it an appropriation to a public use, so as to entitle the owner to compensation. If the owner of a vacant lot in the midst of a city could erect thereon a great wooden building and cover it with shingles, he might obtain a larger profit of his land than if obliged to build of stone or brick with a slated roof. If the owner of a warehouse in a cluster of other buildings could store quantities of gunpowder in it for himself and others, he might be saved the great expense of transportation. If a landlord could let his building for a small-pox hospital, or a slaughter house, he might obtain an increased rent. But he is restrained; not because the public have occasion to make the like use, or to make any use of the property, or to take any benefit or profit to themselves from it, but because it would be a noxious use, contrary to the maxim, *sic utere tuo ut alienum non lædas.* It is not an appropriation of the property to a public use, but the restraint of an injurious private use by the owner, and is therefore not within the principle of property taken under the right of eminent domain." *Commonwealth* v. *Alger*, 7 Cush. 53, 84–86. The universal doctrine on the subject is nowhere more clearly stated than in the foregoing language of Chief Justice *Shaw.* It has been often applied and never questioned in this state.

In *State* v. *Clark*, 28 N. H. 176 (decided in 1854, when the keeping for sale of intoxicating liquor was not unlawful), it was held that a city ordinance, adopted under legislative authority, prohibiting the keeping of liquors in "any refreshment room or restaurant for any purpose whatever" was constitutional. In *State* v. *Noyes*, 30 N. H. 279, it was held that the statute declaring a "bowling-alley situate within twenty-five rods of any dwelling-house, store, shop, schoolhouse, or place of public worship" to be a public nuisance (Laws 1845, *c.* 245), was constitutional, although it deprived the defendant of the use of a bowling-alley lawfully built if not put in operation before the statute took effect. It was not suggested by the defendant's counsel that the act was invalid for the reason that the defendant was deprived of that use of his property without compensation. In *State* v. *Freeman*, 38 N. H. 426, a city ordinance prohibiting restaurants to be kept open after ten o'clock at night was held valid. *Bell*, J., says (*p.* 428): "It is an unavoidable consequence of city ordinances that they in some degree interfere with the unlimited exercise of private rights which were

previously enjoyed. It is one thing to deprive a party of his rights, and quite another to regulate and restrain their exercise in such a manner as the common convenience and safety may require. If it is permissible to interfere in any way with the private right to carry on and manage his lawful business at such time and place and in such manner as suits himself, we are unable to see anything unreasonable in requiring places of public entertainment to be closed at seasonable hours. The guaranty of the constitution is just as effective to secure the citizen against the interference of the legislature as of the city council; and it has never been questioned that the legislature may constitutionally pass laws materially interfering with the business of individuals." In *Morey* v. *Brown*, 42 N. H. 373, an act providing that no one should be liable for killing a dog found without a collar, etc., was held constitutional. *Bartlett*, J., says (*p.* 375): " The plaintiff claims that the act is in conflict with our constitution; but we do not think so. It is not, as he argues, an act to take private property for public uses, or to deprive parties of their property in dogs; but merely to regulate the use and keeping of such property in a manner that seemed to the legislature reasonable and expedient. It is a mere police regulation, such as we think the legislature might constitutionally establish." A statute prohibiting the sale of goods by any person outside his usual place of business, within two miles of a public assembly convened for religious worship (G. S., *c.* 255, *s.* 9), is constitutional. *State* v. *Cate*, 58 N. H. 240.

" Vice, pauperism, and crime may be suppressed and prevented by a variety of measures. In behalf of property, health, life, and morals, the social contract may be performed by destroying buildings, burglars' tools, gambling and counterfeiting implements, and intoxicating liquors. The spread of fire, and physical, mental, and moral disease, may be stopped by vigorous action. Destruction may be protection. For the common security, by the judgment of his peers and the law of the land, an offender may be deprived of his estate, liberty, and life. Wrong may be obstructed and repressed by methods less severe than capital punishment. The protective power may seek, by mild courses, to lessen an evil or check its increase. Instead of destroying the life, liberty, or property of wrongdoers, it may discourage their noxious business and restrain it within certain bounds." *State* v. *Express Co.*, 60 N. H. 219, 257. " The police power of the state extends to the protection of the lives, health, comfort, and quiet of all persons, and the protection of all property within the state; and persons and property are subjected to such restraints and burdens as are reasonably necessary to secure the general comfort, health, and prosperity. . . . The state has authority to make regulations as to the time, mode, and circum-

stances under which parties shall assert, enjoy, or exercise their rights without coming in conflict with any of those constitutional principles which are established for the protection of private rights and private property." *State* v. *White*, 64 N. H. 48, 50. In *State* v. *Campbell*, 64 N. H. 402, a statute prohibiting the sale of milk containing less than a specified per cent of milk solids, though perfectly pure and wholesome, was held valid. The court say (*p.* 403): " Under what is generally called the police power of the state, . . . the sale of bread, the inspection of flour, beef, pork, and other provisions, the practice of medicine, surgery, and dentistry, the licensing of druggists, and the sales of drugs and medicines, are regulated, and the sale of spirituous or intoxicating liquor prohibited, by statute. . . . Such legislation is not open to the objection that it transcends the limits of legislative authority, the purpose and object of such legislation being the protection of the lives, health, comfort, and safety of all persons; and for securing this purpose persons and property are subjected to many restraints and burdens. They are presumed to be rewarded by the common benefits secured." *Bancroft* v. *Cambridge*, 126 Mass. 438, 441. In *Mugler* v. *Kansas*, 123 U. S. 623, 664, 670, it was held that the owners of breweries that were made worthless by a statute forbidding the manufacture of malt liquors were entitled to no compensation for the practical destruction of their property.

Any conceivable statute enacted under the police power, and regulating the use of property, must necessarily affect injuriously individual rights; but in no instance, so far as known, has it been declared by a court of last resort that persons whose interests are so affected are entitled to compensation. Under the law of eminent domain, no one is entitled to compensation for injuries, however serious they may be, caused by public improvements, if no part of his lands or property is taken therefor. *Kennett's Petition*, 24 N. H. 139, 143; *Petition of Mt. Washington Road Co.*, 35 N. H. 134, 146, 147.

The objection that the act is judicial in its character — that in enacting it the legislature exercised judicial power — has no better foundation. *Merrill* v. *Sherburne*, 1 N. H. 199, 203, 204. The precise question was considered and decided in *State* v. *Noyes*, 30 N. H. 279, where it was held that the statute declaring bowling-alleys situated within twenty-five rods of a dwelling to be public nuisances, was not for this reason unconstitutional. *Bell*, J., says (*pp.* 294, 295) : " It is objected to this law that, if otherwise constitutional, it is forbidden by the constitution because it undertakes to determine questions of fact and law, and is judicial in its character. What is or is not a nuisance is a judicial question, it is said, to be determined by courts, and this is clearly so. Nothing is a nuisance unless it is made such by the

law, and to determine what is by the law a nuisance, is an exercise of judicial power. But the legislature do not exceed their legitimate authority when they make a change of the law, and constitute that an offence which was not such before, nor when they make certain acts an offence of a particular kind within which they were not previously included. There may be an apparent unfitness sometimes in such legislation, but its validity has never been questioned. . . . It may be said that a bowling-alley is not of itself a nuisance, since it may either remain unused, or it may be used only as a place of innocent amusement; that its injurious character depends upon the improper use alone. But the legislature may well determine that an instrument which tends to facilitate vicious practices is of itself an evil which ought to be prohibited. There seems to us, then, to be no sound foundation for this exception." *Farnum's Petition*, 51 N. H. 376, 380, 381.

The instances are numerous in which acts and things not nuisances at common law, and in themselves harmless and inoffensive or even beneficial, and only liable to become offensive to the public health or comfort by improper use, have been by statute declared nuisances. Such legislation, whenever brought in question, has been sustained by the courts. P. S., *c.* 108, *ss.* 8, 10, 12, 15. *State* v. *Wilson*, 43 N. H. 415, 420. The following are a few out of many early examples of such legislation : The act of April 6, 1781, against permitting swine to go at large in Portsmouth (Laws, *ed.* 1789, *p.* 174); of February 28, 1786, forbidding gunpowder in excess of ten pounds to be kept in private houses in Portsmouth (*Ib.*, *p.* 184); of January 3, 1792, forbidding the erection or occupation of slaughter houses, or houses for currying leather or trying tallow, in the compact part of any town (Laws, *ed.* 1797, *p.* 194); of January 14, 1795, against permitting horses, etc., to go at large without fetters (*Ib.*, *p.* 340); of February 18, 1794, forbidding gunpowder in excess of ten pounds to be kept in private houses or in vessels at the wharves in Portsmouth (*Ib.*, *pp.* 359, 360); of June 16, 1791, against permitting swine to go at large in any town without being yoked and ringed, or at all in Portsmouth (*Ib.*, *p.* 370); of June 16, 1792, prohibiting the casting of gravel, stones, ashes, etc., into Portsmouth harbor (*Ib.*, *p.* 391); of June 22, 1786, prohibiting the setting of gill nets in Ammonoosuc river (*Ib.*, *p.* 402); of January 9, 1795, prohibiting seines, nets, and pots in Connecticut river (*Ib.*, *p.* 404). The act of October 19, 1887 (Laws 1887, *c.* 77; P. S., *c.* 205, *s.* 4), declaring any building used for the illegal sale of spirituous or malt liquors, wine, or cider to be a common nuisance, has been sustained by many decisions. Whether a statute restricting individual rights, that is enacted for the purpose of protecting the public health, may be declared

unconstitutional and void because in the opinion of the court it has no such effect, is a question not raised. It is found that the tendency of sawdust in the water is to render it unwholesome. It is needless to pursue the subject. It is enough to say that this objection cannot be sustained without overruling *State* v. *Noyes, supra.*

The principal ground relied upon is that the act is local in its operation. It is not, it is said, equal and uniform, and does not apply to all persons similarly situated. It operates, it is urged, against a class only and those engaged in a particular occupation in a part only of the state. It is said that "If the water supply of Manchester needs a sawdust law, the water supplies of other towns in the same situation need the same law. If an infusion of sawdust is unwholesome for the people of Manchester, it is unwholesome for other people. . . . If Massabesic can be selected by a state law for protection unknown elsewhere, the well of a Massabesic farmer can be protected by a penal enactment applicable to no other well. . . . All wells, springs, and brooks from which the owners and their families take their supply of water for domestic purposes are equally entitled to protection. A statute making it a felony or misdemeanor to put sawdust or other substance in the well of A. B. in Haverhill, and leaving all other wells in the state protected by the common law alone, would be valid if the act of 1891 is valid in giving Manchester a protection against sawdust that is not given to anybody else in the same situation. Under a state law equality is a right, or the construction repeatedly put upon the constitution from 1827 to the present time is a false pretence."

In other words, it is claimed that a general law applicable to a particular place, or not applicable throughout the entire state, is unconstitutional. The legislature cannot make an act a penal offence in one locality, as a city, town, or other place, where for the public welfare the legislation is necessary, without also making it penal in all other parts of the state, though in none of them is the protection necessary or desirable. It cannot forbid the killing of the few deer found in the small and scattered forests of Cheshire county, without also forbidding it in the vast wilderness of Coös, though there they become so numerous as to be a pest. It cannot protect the wells of Haverhill, where the state of society makes protection necessary, without extending it to all other wells, although they need no protection. It cannot confer an authority upon one town which it does not give to all. Legislation required for the public good in Strafford county must be made applicable to Grafton, though there it is injurious. The acts for the protection of the Dustin monument (Laws 1874, *c.* 45) and of Corbin park (Laws 1895, *c.* 258) are unconstitutional and void. If, however, the words, " or any

other like monument in the state," "or any other like park in the state," were added, though no other such monument or park exists, the statutes would be valid; that is to say, the constitutionality of a statute may depend upon the presence or absence of words that in practical effect are immaterial.

If this is sound constitutional law, more than a thousand invalid statutes have been enacted since the adoption of the constitution. In numerous instances rights under them have been enforced, and punishment for their violation has been inflicted by judicial action. Not one in a hundred of such cases appears in the reports, and in two only of the reported cases (*Scott* v. *Willson*, 3 N. H. 321, and *Charter of Manchester*, 47 N. H. 277) was this objection taken, in both of which it was overruled. In all this class of cases for more than a hundred years our courts have administered to the people gross injustice instead of constitutional justice.

No clause in the constitution condemning such legislation is pointed out. No judgment of the court declaring it invalid is cited. No such decision can be found. The sole argument of the defendant in support of his position is that the act is inconsistent with "the equality of right which the constitution secures to all,— that it discriminates in favor of some citizens to the detriment of others."

The argument is without foundation in fact. The statute makes no discrimination. It does not permit some persons and forbid others to put sawdust in the lake. Everybody is prohibited. "Any person," says the statute, who puts sawdust in the lake shall be punished. True it is that the prohibition affects the owners of sawmills on the lake shore more seriously than the farmers, and it affects the farmers there dwelling more seriously than the farmers of Coös. Such is necessarily the effect of all restrictive laws. They affect some persons more than others. A similar objection might be made against the larceny law. It has no effect upon the great body of the people, but upon a small class only, namely, the thieves. In the sense of the defendant's argument, it is as unequal as the sawdust law.

The act confers upon Manchester or its citizens no individual or exclusive right or benefit, within the meaning of the constitution. Every inhabitant of the state is entitled to enjoy the benefits conferred by the statute on complying with the necessary conditions, as he may, if he choose, enjoy the benefit of the aqueduct itself or of any other property taken for the public use. If this act violates the law of equality prescribed by the constitution because only the fifty thousand inhabitants of Manchester are directly benefited by it,— because to reap its benefit a person must go to Manchester,— all acts authorizing the condemnation of private property for aqueducts, cemeteries, or

other public uses, which from their nature can be enjoyed only in the towns and cities where they are located, are equally invalid. It is impossible to hold that the legislation in the latter case is for the public good, and that it is not in the former.

The equality of the constitution is the equality of persons and not of places — the equality of right and not of enjoyment. A law that confers equal rights on all citizens of the state, or subjects them to equal burdens, and inflicts equal penalties on every person who violates it, is an equal law, though no one can enjoy the right, be subjected to the burden, or infringe its provisions, without going to or being in a particular part of the state. It does not discriminate in favor of some at the expense of others.

There are places regarding which any protective legislation must necessarily be special, as, for example, Corbin park and the state house yard. Laws 1883, c. 12; P. S., c. 7, s. 5. If general in form, it would be special in substance. There are few if any towns, cities, or other subdivisions of the state, whose situation and circumstances are so nearly alike that legislation may not be required for one that is not necessary or desirable for any other. Many may be so differently situated that legislation essential for one would be injurious to the others.

No two cities in the state are governed by exactly the same ordinances. Acts made penal offences in some cities are innocent in others. No two charters are alike. Some cities have over them a police commission, while others select and control their police officers. Their authority and their ordinances differ in many particulars. So it is, in perhaps a less degree, with towns. Many have been given authority which others do not possess. Their by-laws (P. S., c. 40, ss. 7, 8) are not uniform. Acts forbidden in some towns are permitted in others.

It is said that this lack of uniformity results " from the exercise of limited powers of local government granted to towns and cities," and therefore has no bearing on the present question. In the first place, it is not, as a matter of fact, altogether a result of local ordinances and by-laws; much of it is created by the direct action of the legislature, as, for example, in the creation of police commissioners and in conferring special powers upon particular towns. In the next place, acts under a delegated power are the acts of the principal. The principal cannot confer upon his agent a power which he does not himself possess. Whatever by-laws and ordinances the legislature can lawfully authorize towns and cities to adopt, it has the constitutional power to enact directly. *Wooster* v. *Plymouth*, 62 N. H. 193, 208–210; *State* v. *Noyes*, 30 N. H. 279, 293. The legislature may at any time resume the delegated powers. *School District* v. *Smart*, 18 N. H. 268, 273; *Lisbon* v. *Clark*, 18 N. H. 234; *Stevens* v. *Dimond*, 6

N. H. 330, 331; State v. Hayes, 61 N. H. 264, 335; Berlin v. Gorham, 34 N. H. 266, 275. If the legislature is by the constitution forbidden to enact such laws, it cannot authorize towns and cities to enact them. It cannot confer a power it does not itself possess.

It is not for the court to inquire into the wisdom or unwisdom of such legislation. Whether the act " be wise, reasonable, or expedient, is a legislative and not a judicial question. The legislature is as capable of determining the question of the wisdom, reasonableness, and expediency of the statute, and of the necessity for its enactment, as the courts. The only inquiry is whether the statute conflicts with the constitution." State v. Marshall, 64 N. H. 549, 550. Farnum's Petition, 51 N. H. 376, 378. The question is one of constitutional power.

It is not easy to see how a requirement that all general statutes shall be made applicable equally to all similarly situated portions of the state could be given practical effect unless the legislature were made the final and exclusive judge of what places, towns, or cities are so situated. Cool. Con. Lim. (4th ed.) 156, note. It is a question of fact. Is it to be determined by a jury, and the validity or invalidity of the statute made to depend upon their verdict? State v. Campbell, 64 N. H. 402, 404.

The question is concluded by our decisions. In Scott v. Willson, 3 N. H. 321, decided in 1825, it was held that an act regulating the mode of putting pine timber into Connecticut river was not repugnant to the constitution, for the reason that it "does not embrace all rivers, but is confined to Connecticut river." Richardson, C. J., says (p. 328): "It has been decided in Massachusetts that an act attempting to suspend the operation of a general law in relation to a particular person was unconstitutional. Holden v. James, 11 Mass. 396. But that decision has no bearing upon the question to be decided in this case. Here the objection is not that the law does not extend to all persons, but that it does not extend to all places. The objection in truth is that the statute is a general law in relation to a particular place. But we have been referred to no clause in our constitution which restrains the legislature from passing such a law; nor have our researches enabled us to find any such clause." Chief Justice Richardson and his associates thought the proposition so obviously sound as to require no elaboration. It is needless to say that nothing is to be found in the Opinion of the Justices, 4 N. H. 565, inconsistent with this doctrine.

In Charter of Manchester, 47 N. H. 277, decided in 1867, it was held that an act requiring the check-list in the city of Manchester to be regulated in a different manner from that prescribed by the general law in all other places, towns, or cities was not for

that reason unconstitutional. *Sargent*, J., says (*p.* 279): "But it may be said that the rule should be uniform and administered alike in all places. There might be more weight in this objection if all the other attendant circumstances were the same. We by no means intimate an opinion that the legislature might not constitutionally impose these duties relative to the check-list upon one set of officers in some towns and counties and upon a different board in other towns and counties. The legislature may constitutionally pass a general law in relation to a particular place. *Scott* v. *Willson*, 3 N. H. 321, 328; *State* v. *Noyes*, 30 N. H. 279. So general statutes have been passed in regard to schools in Portsmouth ·and in Somersworth, differing widely from the general law relating to schools in other parts of the state. C. S., *cc.* 80, 81. But when we consider the difference between the wards of a city and towns not connected with any city, we see at once that there is such a difference in circumstances as may well justify a difference in the board selected to perform these duties, if such a justification were necessary." The question was directly involved in *State* v. *Franklin Falls Co.*, 49 N. H. 240 (1870). It was there held that the statute (G. S., *c.* 251, *s.* 20) prohibiting the maintenance of dams on the Winnipiseogee river (and five others) was constitutional. The objection that the statute was local in its application was not alluded to either by counsel or the court, and for the reason, undoubtedly, that they understood that it was not tenable,— that the question was not an open one. The same is true of *State* v. *Roberts*, 59 N. H. 256, 484 (1879), where the defendant was indicted, convicted, and presumably punished for taking trout from his own pond, under a statute prohibiting the taking of trout in certain months from any waters of the state except certain lakes and a certain ·pond. So, also, of *Purinton* v. *Ladd*, 58 N. H. 596, which was debt for the penalty under the same statute. Laws 1872, *c.* 55.

The latest judicial declaration bearing upon the question is found in the *Opinion of the Justices*, 66 N. H. 629, 665, where it is said that " a special act is not to be declared void because it is opposed to a spirit supposed to pervade the constitution, but not made an operative part of it by express words or necessary implication, that is, by fair construction."

Until 1864, deposits in savings banks were taxed to the depositors like other property. R. S., *c.* 39, *s.* 3; C. S., *c.* 41, *s.* 4; Laws 1864, *c.* 4028. By the act of 1864, the banks were required to pay a tax of three fourths of one per cent on the deposits, to be in full of all taxes on the depositors on account of the deposits. In 1869, the tax was increased to one per cent (Laws 1869, *c.* 4, *s.* 3), and so it remained until 1895, when it was reduced to three fourths of one per cent. Laws 1895,

*c.* 108. This was a heavy discrimination in favor of the depositors. *Bank* v. *Concord*, 59 N. H. 75, 78. They were required to pay in many towns less than one half the tax assessed on other property. Yet notwithstanding the express provisions of the constitution, by which the general court may "impose and levy proportional and reasonable assessments, rates, and taxes upon all the inhabitants of and residents within the said state, and upon all estates within the same " (*art.* 5), require,"in order that such assessments may be made with equality," that a valuation of the estates be taken anew once in every five years (*art.* 6), and declare that "every member of the community . . . is bound to contribute his share " of the public expense (Bill of Rights, *art.* 12), and notwithstanding the numerous judicial decisions thereon (*State* v. *Pennoyer*, 65 N. H. 113, 114), this court, in 1883, less than twenty years after the enactment creating the discrimination, declared that "the savings bank tax is an anomaly, resting on peculiar grounds of public policy, and is universally understood to have acquired the position of an exception to the constitutional rule of equality." *Railroad* v. *State*, 62 N. H. 648, 649. How did it become an exception? Solely by virtue of the statute creating it, and less than twenty years of public acquiescence.

In *Morrison* v. *Manchester*, 58 N. H. 538, 551, 552 (decided in 1879), the court said : "In this state the taxability of money at interest is not an open judicial question. Whether the assessment of money at interest is a process of ascertaining the lender's or the borrower's just share of the public expense, or an exceptional, double, or otherwise wrongful taxation of the borrower . . . permitted, not required, by an erroneous constitutional construction established by legislative usage and judicial recognition, we need not inquire. If the assessment of a creditor for his interest-bearing loan of money is, in effect, either a double taxation of his debtor, or a taxation of the debtor for property which, by conveyance or destruction, has ceased to be his, . . . such taxation is sustained by the authority of precedent. . . . The precedent is too firmly established to be overthrown by any other authority than that of making laws." In other words, a legislative usage for something less than one hundred years, accompanied by judicial recognition, is sufficient to establish a rule of taxation forbidden by the constitution. "Local self-government . . . in uninterrupted operation more than two hundred and forty years has been constitutionally established by recognition and usage." *Doe*, C. J., *State* v. *Hayes*, 61 N. H. 264, 322. "When a question arises as to the contemporaneous meaning of the terms used in an ancient instrument, early and long continued usage has a controlling weight." *The Dublin Case*, 38 N. H. 459, 512; *Pierce* v. *State*, 13 N. H. 536, 573;

*Company* v. *Fernald*, 47 N. H. 444, 459 ; *Copp* v. *Henniker*, 55 N. H. 179, 209; *King* v. *Hopkins*, 57 N. H. 334, 356; *Keniston* v. *State*, 63 N. H. 37, 38.

Immediately upon the adoption of the constitution in 1784, the legislature (many members of which, and of succeeding legislatures, were members of the convention and participated in framing the constitution) began to enact general laws applicable to particular places. They have continued to do so from that time to this,— more than a hundred years. There have been few, if any, legislative sessions during which one or more statutes of this character have not been enacted. Their number is very great. They have been sanctioned by judicial decisions. Not a *dictum* or intimation against their validity is to be found in our reports ; nor, it is believed, in those of any other state, in the absence of express constitutional prohibition. They have been acquiesced in by the public. Under them, rights have accrued and have been enforced. Many persons have been punished for violating them. It is not claimed that such legislation is expressly forbidden. Conceding (for sake of the argument) that it is unwise and opposed to the general spirit of the constitution, this long continued usage, recognition, and acquiescence must (even if there were no judicial decision on the subject), under our established doctrine of constitutional construction, be held decisive upon the question of legislative power.

" Laws public in their objects may, unless express constitutional provision forbids, be either general or local in their application ; they may embrace many subjects or one, and they may extend to all citizens or be confined to particular classes, as minors, married women, bankers, or traders, and the like. The authority that legislates for the state at large must determine whether particular rules shall extend to the whole state and all its citizens, or, on the other hand, to a subdivision of the state or a single class of its citizens only. The circumstances of a particular locality, or the prevailing public sentiment in that section of the state, may require or make acceptable different police regulations from those demanded in another, or call for different taxation and a different application of the public moneys. The legislature may therefore prescribe or authorize different laws of police, allow the right of eminent domain to be exercised in different cases and through different agencies, and prescribe peculiar restrictions upon taxation in each distinct municipality, provided the state constitution does not forbid. These discriminations are made constantly; and the fact that the laws are of local or special operation only, is not supposed to render them obnoxious in principle. The business of common carriers, for instance, or of bankers, may require special statutory regulations for the general benefit, and it may be matter of public policy to give

laborers in one business a specific lien for their wages, when it would be impracticable or impolitic to do the same by persons engaged in some other employments. If the laws be otherwise unobjectionable, all that can be required in these cases is that they be general in their application to the class or locality to which they apply; and they are then public in character, and of their propriety and policy the legislature must judge." Cool. Con. Lim. (6th ed.) 479–481.

*Appeal dismissed.*

All concurred.