Hillsborough,
No. 4512.

LAWRENCE W. SHIRLEY *& a.*

*v.*

NEW HAMPSHIRE WATER POLLUTION COMMISSION *& a.*

Argued June 6, 1956.
Decided July 6, 1956.

*Sheehan, Phinney & Bass (Mr. Phinney* orally), for the plaintiffs.

*Louis C. Wyman,* Attorney General, and *Arthur E. Bean, Jr.,* Assistant Attorney General (*Mr. Bean* orally), for the defendants.

DUNCAN, J. So far as this action is against the State, it may not be maintained because the State has not consented thereto. *Rothrock* v. *Loon Island,* 96 N. H. 421, 422, and cases cited; *Wiseman* v. *State,* 98 N. H. 393. Since it is claimed however, that the Water Pollution Commission is acting pursuant to an invalid statute, and the plaintiffs allege that in consequence they will be required to pay taxes for an illegal purpose, the action may be maintained against the Commission. *Conway* v. *Water Resources Board,* 89 N. H. 346.

The pendency of the bill in equity brought by the State is not thought to preclude consideration of the petition now before us. The issues now raised were not presented in the action brought by the State, and no reason appears to require that the plaintiffs present their contentions as intervenors in that action. It is true that the order of the Commission does not charge the plaintiffs with the responsibility of abating the pollution but is directed to the town. It may be that technically the plaintiffs have no right at this time to raise the issue. The town did not raise it in the equity action, and it does not appear that the plaintiffs sought to have it do so. See *deRochemont* v. *Holden,* 99 N. H. 80; *School District* v. *Royal Oak School District,* 293 Mich. 1. Whatever the technical rights of the plaintiffs may be, it is evident that the town cannot comply with the Commission's order without the expenditure of funds to which the plaintiffs as taxpayers will ultimately be re-

quired to contribute. Their right to question the legality of such expenditure is clear (*Conway* v. *Water Resources Board, supra*) and no reason to postpone consideration of the issues is suggested. We therefore direct our attention to the merits of the plaintiffs' contentions.

The plaintiffs' claim in essence is that the act of the Legislature in classifying as "Class B-1 waters" so much of the Piscataquog River as is involved in these proceedings was without reasonable justification, and so clearly unreasonable as to make its action unconstitutional. Incidental to this claim is the plaintiffs' contention that the classification made was for the benefit of a limited class and not for a public purpose. The latter contention is a factor to be taken into account in determining the major issue. However the fact that some citizens will derive special benefit, to the detriment of others is not conclusive of the question of whether the action taken is for a public purpose. *State* v. *Griffin,* 69 N. H. 1; *Canaan* v. *District,* 74 N. H. 517; *State* v. *4.7 Acres of Land,* 95 N. H. 291, 295; *Duncan* v. *Jaffrey,* 98 N. H. 305.

Comprehension of the plaintiffs' argument requires some review of the factual background. As was pointed out in *State* v. *Goffstown, supra,* the order complained of requires the town to adopt no specific method of abating the pollution which results from the discharge of untreated sewage. It does require that the pollution shall be abated to the extent necessary to convert what are now "Class C" to "Class B-1 waters." Class B-1 waters are distinguished from Class C and other lower classifications, by certain technical requirements, and by being "acceptable for bathing and . . . after adequate treatment, for use as water supplies." RSA 149:3 II (a), III.

The order of the Commission is merely in enforcement of the classification made by the Legislature. Classification was made pursuant to earlier legislation, providing for state-wide control of pollution and the disposal of wastes. Laws 1947, c. 183. Similar acts classifying other streams and bodies of water are cited in the annotation which follows RSA 149:6. Other waters in the Piscataquog River watershed were classified by Laws 1951, c. 32, s. 1 II and c. 43, s. 1.

The provisions of Laws 1953, c. 38, s. 1 II operated to make uniform the classification of all of the waters within the Piscataquog River watershed as Class B-1 or better, except for the short section of the river between the Kelley's Falls Dam and the

Merrimack River, which is admittedly polluted, and although presently unclassified by the Legislature is in fact within the Class D classification.

With respect to the classification made by Laws 1953, c. 38, the procedure established by RSA 149:6 was followed, and the Commission is presumed to have determined that the recommended classification was "for the best interest of the public giving consideration to the health, industrial, economic, geographical and social factors involved." *Id.*, IV. There was available to the Legislature a staff report of the Commission published in 1952, dealing specifically with the "Piscataquog River Watershed," which contained factual information acquired during the years 1946 to 1952, and related findings. Following the classification made by the Legislature in Laws 1953, c. 38, no application for a variance was filed pursuant to RSA 149:9. However in February 1955, petitions filed by residents of the county for reinvestigation of conditions and reclassification of the waters here in question as Class D waters, "devoted primarily to the transportation of sewage or industrial wastes" were denied by the Commission in August, 1955. See RSA 149:7.

The Commission's report indicates that the Piscataquog River watershed embodies an area of 202 square miles and that the main river from its headwaters to its terminus at the Merrimack River is about 36 miles long. The portion of the river involved in this case lies between its junction with the South Branch in Goffstown, and the crest of Kelley's Falls Dam in Manchester and is approximately 7½ miles in length. Within that distance lie two artificial ponds approximately 2 miles apart, the upper one known as "Glen Lake," created by the Gregg's Falls Dam of the Public Service Company of New Hampshire, and the lower as "Kelley's Falls Pond," created by the Kelley's Falls Dam of the same company. The upper pond is over a mile in length, and has an area of about 160 acres. The lower pond is also approximately a mile in length, and covers an area of approximately 147 acres. The ponds are concededly fully controlled by Public Service Company of New Hampshire for the generation of power at its dams. The report states that its "stations have been in operation for the last forty years or more and there is every indication that they will continue to be useful for many years." It further states that a considerable recreational use has developed over the same period upon both of the ponds. Summer camps and cottages on the northerly shores

of Glen Lake, and both the north and south shores of Kelley's Pond including some year-round homes approximate 250 structures, with accommodations for 1000 to 1500 persons. The use made of the waters of this section of the river by Public Service Company of New Hampshire in the generation of power at its two power stations is of primary importance. A second use of importance is the recreational use made of the two ponds and the connecting stream, where boating, swimming and fishing are afforded to both owners of properties about the ponds and to members of the public, who have access at locations designated as "Moose Club Park, Lynchville Park, Riverview Park and Pinardville." The studies made by the Commission disclose that pollution of the waters of Glen Lake "constitute[s] a general hazard to health since the Lake is now used for bathing." Similarly the studies disclose that the pollution of Kelley's Falls Pond is far above the "bacterial standards for bathing water quality applied throughout the country." The conclusion reached by the report is that the B-1 classification "appears to be essential . . . for the area if the present use is to be continued." The reported recreational use is characterized as "an important use of the stream which if discontinued could produce a definite economic impact to the area."

The plaintiffs urge that the motivating force behind the classification recommended by the Commission and adopted by the Legislature "was not the protection of the public health, but rather was economic." They suggest that public health could be protected by simply forbidding bathing in the waters involved. They assert that the effect of the classification is to compel the taxpayers of Goffstown to develop for the especial benefit of a few, a limited area of the town for recreational use, the continuation of which depends not upon public right, but upon permission of the company which has created and controls the ponds in question. This they argue, is not a public purpose, or for the public benefit, and is so clearly unreasonable as to be unconstitutional. "[T]he legislature cannot by its mere fiat make that reasonable which is indisputably unreasonable." *Carter* v. *Craig*, 77 N. H. 200, 206.

The control and elimination of water pollution is a subject clearly within the scope of the police power. *Meredith* v. *State*, 94 N. H. 123, 128, 129, and cases cited; *State ex rel. Martin* v. *Juneau*, 238 Wis. 564; *Madison Metr. Sewerage Dist.* v. *Committee*, 260 Wis. 229; *Huntington* v. *State Water Commission*, 137 W. Va. 786. See also, *Dederick* v. *Smith*, 88 N. H. 63, 67. Its tendency to

promote the public health and welfare cannot seriously be questioned. *Cf. State* v. *Ramseyer,* 73 N. H. 31, 36. A statute enacted for that purpose is to be sustained unless it is invalidated because of constitutional limitations. The fact that some other and perhaps less burdensome regulation might tend to further a like purpose does not of itself demonstrate the statute's invalidity. *Maritime Packers* v. *Carpenter,* 99 N. H. 73, 78. *Cf. Richardson* v. *Beattie,* 98 N. H. 71.

"It is . . . established law in this jurisdiction that when the police power of the state is invoked by the legislature in the enactment of a statute for a proper purpose, such a statute will not be declared unconstitutional merely because it restricts some of the rights secured to individuals by the fundamental law. It will be declared invalid only when the restrictions thus imposed are found to be unreasonable. *Woolf* v. *Fuller,* 87 N. H. 64, 68; *Carter* v. *Craig, supra,* [207]; *State* v. *Normand,* 76 N. H. 541.

"In passing upon the issue of reasonableness, the importance of the public benefit which the legislation seeks to promote is to be balanced against the seriousness of the restriction of private right sought to be imposed. If a statute is directed to a public interest of minor importance and yet imposes serious restriction upon guaranteed rights, the conclusion that it is unreasonable may be required. *Woolf* v. *Fuller,* 87 N. H. 64." *Dederick v. Smith, supra,* 68. See also, *Willis* v. *Wilkins,* 92 N. H. 400, 404, 405.

In furthering the purposes of the Water Pollution Act the Legislature was not restricted merely to consideration of hazards to public health or of any other single factor. In the exercise of the protective power it was entitled to consider all public benefits to be derived from the improvement of water conditions, including economic benefits. See *Opinion of the Justices,* 99 N. H. 528. Clearly the reduction of pollution of a public stream to the point required by the classification prescribed by this statute is calculated to decrease the hazards to public health. Even though the public right involved may be limited to the scope of the right in the river in its natural state, the Legislature was not bound to close its eyes to uses actually made of the artificial ponds. It was not required to disregard the fact that for years past the public and the owners of property surrounding the ponds have enjoyed a use for recreational purposes; and so far as appears will continue to do so. The hazards to the general public arising from existing conditions could not be ignored. The public which would receive the benefits

accruing from the fostering of recreational uses or the adoption of health-protective measures was not necessarily to be considered limited to those members of the public who participated in the recreational use.

As previously stated, the validity of the legislative action is to be determined by balancing the "importance of the public benefit which is sought to be promoted against the seriousness of the restriction of private right sought to be imposed." *Richardson* v. *Beattie,* 98 N. H. 71, 75, 76. The Legislature was clearly aware that the classification adopted by it would occasion expense to the town of Goffstown and to its individual taxpayers. In adopting the classification established by Laws 1953, *c.* 38, it concluded that the public benefits would outweigh the burden upon the individual. A conclusion that only a limited class of persons will benefit from the classification is not compelled. The "public interest" to which the statute was directed was not so clearly "of minor importance" (*Dederick* v. *Smith, supra,* 68) as to make the action of the Legislature in enacting it "indisputably unreasonable." *Carter* v. *Craig, supra,* 206. We are therefore bound to sustain it.

It follows that the order of the Water Pollution Commission is a valid one, founded upon a valid law. The plaintiffs' action therefore may not be maintained. *Wiseman* v. *State,* 98 N. H. 393, 398.

*Petition dismissed.*

All concurred.