COMMISSIONER OF NATURAL RESOURCES & another *vs.*
S. VOLPE & CO., INC.

Suffolk.   December 9, 1964. — April 26, 1965.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & REARDON, JJ.

*Fisheries. Conservation. Marsh. Coastal Waters. Constitutional Law,*
Public purpose, Fisheries, Conservation, Police power, Eminent domain,
Due process of law, Delegation of powers. *Eminent Domain,* What
constitutes taking. *Regulation.*

G. L. c. 130, § 27A, so far as it relates to the protection of shellfish and
marine fisheries, was enacted for a public purpose.   [107]
The execution of a policy determined by the Legislature may be delegated
to an appropriate officer or board.   [107]
Although a "condition" imposed by the Director of Marine Fisheries under
G. L. c. 130, § 27A, prohibiting the filling of a substantial coastal marsh
area for the construction of houses was imposed for the public purpose
of preserving the area for the protection of shellfish and marine fish-
eries, the "condition" would be unconstitutional and invalid if it would
result in such a deprivation of the practical uses of the area as to be
the equivalent of a taking thereof without compensation.   [111]

BILL IN EQUITY filed in the Superior Court on January 20, 1964.

The suit was heard by *Cahill,* J.

*Herman Snyder* (*Philip Markell* with him) for the de-
fendant.

*John E. Sullivan,* Assistant Attorney General, for the plaintiffs.

Commissioner of Natural Resources *v.* S. Volpe & Co. Inc.

WILKINS, C.J.   The Commissioner of Natural Resources and the Director of Marine Fisheries bring this bill in equity against S. Volpe & Co., Inc., a corporation of Massachusetts, to enjoin the defendant "from placing any further fill on Broad Marsh in the Town of Wareham" in violation of a condition imposed by the commissioner, and to order the defendant "to remove all fill placed on and in Broad Marsh" in violation of that condition.   After a hearing a final decree was entered in which the defendant was enjoined and ordered accordingly.   The defendant appealed. The judge made a report of the material facts found by him, from which, unless otherwise stated, are taken the facts in this opinion.   G. L. c. 214, § 23 (as amended through St. 1947, c. 365, § 2).   The evidence is reported.

Broad Marsh is located westerly of Sunset Cove off Onset Bay in the coastal waters of Wareham.   A tidal creek known as Broad Marsh Creek flows through the northerly portion of the marsh into Squaw's Hole, the northwestern end of Sunset Cove.   The tide flows through mosquito control ditches in the marsh, at times flooding it.

In 1960 the defendant acquired a parcel of land containing 49.4 acres within Broad Marsh, which covers a total of 78 acres more or less.   On October 3, 1963, as alleged in the bill, admitted in the answer, and found by the judge, the defendant gave written notice pursuant to G. L. c. 130, § 27A (inserted by St. 1963, c. 426),[1] of "its intention to dredge a channel and basin into said Broad Marsh in connection with a marina to be constructed adjacent thereto at some future date."   This finding is accurate as far as it goes, but, as we ourselves find, the channel, basin, and

---

[1] Section 27A provides in part: "No person shall remove, fill or dredge any bank, flat, marsh, meadow or swamp bordering on coastal waters without written notice of his intention to so remove, fill or dredge to the board of selectmen in a town . . ., to the state department of public works, and to the director of marine fisheries. . . .   The selectmen . . . shall hold a hearing on said proposal . . . .   If the area on which the proposed work is to be done contains shellfish or is necessary to protect marine fisheries, the said director may impose such conditions on said proposed work as he may determine necessary to protect such shellfish or marine fisheries, and work shall be done subject thereto. . . .   [T]he superior court shall have jurisdiction in equity to restrain a continuing violation of this section. . . ."

marina were incidental to the defendant's main project of filling the marsh for the construction of houses with water rights for boating.

On October 9, 1963, the board of selectmen of Wareham, pursuant to § 27A, conducted a hearing on the defendant's application. At the hearing the plaintiffs requested from the defendant a detailed plan of the proposed work. On October 21 this was furnished. Thereafter the director notified the defendant "that in the interest of protecting marine fisheries and maintaining the ecological components of this estuarine complex in their present protective form" "no fill of any type be placed upon that area known as Broad Marsh." The director did not, and does not now, object to the dredging of the channel and basin.

The defendant disputed that the condition contained in this notice was authorized by § 27A, and ignoring the director's notification, commenced filling Broad Marsh and continued doing so until temporarily enjoined on January 20, 1964. The local authorities, the State Department of Public Works, with reference to G. L. c. 91, § 30, § 30A (inserted by St. 1950, c. 214), and the Secretary of the Army acting through the Corps of Engineers under 33 U. S. C. § 403 (1958) have all approved the project.

The trial judge concluded (A) that the restriction of "no fill" is a condition authorized by § 27A; (B) that Broad Marsh is a "saltmarsh" necessary to preserve and protect marine fisheries; (C) that § 27A is valid; and (D) that the "condition" imposed is not an unlawful taking entitling the defendant to compensation.

In support of his general findings (A) and (B) the judge found the following: "The important biological significance of Broad Marsh is its nutrient contribution to the shellfish and other fishery resources of the Sunset Cove – Onset Bay area. The two most conspicuous plants of Broad Marsh are the cordgrasses, Spartina Patens and Spartina Alterniflora. As these plants die and decay, large amounts of phosphates and nitrates are released into the adjacent waters. These nutrients are essential for the growth of

microscopic plants and other micro-organisms, which in turn are the primary source of nutrition for shellfish as well as the young fish and crustaceans." "[T]he nutrients derived from Broad Marsh, and, in particular, the portion thereof intended to be filled by the . . . [defendant], play an important and integral part in sustaining the life of the shellfish and finfish in the areas adjacent thereto. . . . Without these nutrients untoward damage will result to the marine fisheries which depend on the productivity of the adjacent marsh for their sustenance." We cannot pronounce these findings plainly wrong. Two experts for the plaintiff have provided supporting testimony.

As to the trial judge's finding (C), the protection of marine fisheries is undoubtedly a public purpose for which § 27A was properly enacted. The Legislature clearly has power to protect and preserve the fish and game of the Commonwealth. *Commonwealth* v. *Gilbert,* 160 Mass. 157, 160. *Commonwealth* v. *Sisson,* 189 Mass. 247, 251. *Lyman* v. *Commissioners on Fisheries & Game,* 211 Mass. 10, 11–12. See *Lawton* v. *Steele,* 152 U. S. 133, 138–139. To this end, once a policy has been determined, its execution may be delegated to an appropriate public officer or board. *Commonwealth* v. *Sisson, supra,* 252. *Commonwealth* v. *Hudson,* 315 Mass. 335, 341. *Commonwealth* v. *Diaz,* 326 Mass. 525, 527.

This is not the whole matter, however. A crucial issue is whether, notwithstanding the meritorious character of the regulation, there has been such a deprivation of the practical uses of a landowner's property as to be the equivalent of a taking without compensation. *Mile Rd. Corp.* v. *Boston,* 345 Mass. 379, 383. See *Goldblatt* v. *Hempstead,* 369 U. S. 590, 592–594.

The trial judge recognized the existence of this question, but the narrow finding of the scope of the project above referred to led to other findings which are inapplicable to the realities of the case and must be disregarded as lacking support in the evidence. Thus he found that the plaintiffs have not placed an absolute restraint on the defendant in

imposing the condition prohibiting filling Broad Marsh; that the condition imposed relates only to the filling of Broad Marsh and does not completely restrain the defendant's commercial enterprise, which may be conducted and completed by alternative methods; that the defendant is not prevented from dredging and transporting the dredged material to any location other than Broad Marsh, thus causing no damage to marine fisheries; that the defendant may dredge a greater distance through Broad Marsh to upland property which it owns and where no significant nutrient values necessary to protect marine fisheries are extant; that the condition imposed by the director is reasonable; and that "[s]imply stated, he desires the . . . [defendant] to locate its proposed marina, yacht club and recreational center shoreward of Broad Marsh and to place no fill on the said marsh."

The question is analogous to that which arises when the validity of a zoning ordinance or by-law is considered. Whether there is a reasonable interference with a landowner's rights undertaken in the exercise of the police power for the public benefit or a deprivation of private property without compensation often depends upon the facts of the particular case. *Pittsfield* v. *Oleksak,* 313 Mass. 553, 555. *Aronson* v. *Sharon,* 346 Mass. 598, 603. This court has often held that on the facts presented in a given case a regulation achieves no valid public benefit and also so restricts the use of property as to constitute a taking without compensation. *Barney & Carey Co.* v. *Milton,* 324 Mass. 440, 445. *Gem Properties, Inc.* v. *Board of Appeals of Milton,* 341 Mass. 99, 105–106. *Jenckes* v. *Building Commr. of Brookline,* 341 Mass. 162, 166. See *122 Main St. Corp.* v. *Brockton,* 323 Mass. 646, 648–649; *Aronson* v. *Sharon,* 346 Mass. 598, 603.

Two zoning cases in other jurisdictions may have pertinency. In *Morris County Land Improvement Co.* v. *Township of Parsippany-Troy Hills,* 40 N. J. 539, the municipality had placed the plaintiff's swamp property in a floodwater detention basin. At pages 556–557, it was said, "We

cannot agree with the trial court's thesis that, despite the prime public purpose of the zone regulations, they are valid because they represent a reasonable local exercise of the police power in view of the nature of the area and because the presumption of validity was not overcome. In our opinion the provisions are clearly far too restrictive and as such are constitutionally unreasonable and confiscatory." In *Dooley* v. *Town Plan & Zoning Commn.* 151 Conn. 304, the facts were similar. The plaintiffs were aggrieved landowners. The town of Fairfield amended its zoning regulations to create a new zone called "flood plain district," and to forbid excavation, filling, and removal of soil, earth, or gravel subject only to a special exception. At pp. 311–312, it was said, "There can be no doubt that, from the standpoint of private ownership, the change of zone to flood plain district froze the area into a practically unusable state. The uses which are presently permitted in the new zone place such limitations on the area that the enforcement of the regulation amounts, in effect, to a practical confiscation of the land. . . . The plaintiffs have been deprived by the change of zone of any worthwhile rights or benefits in their land. Where most of the value of a person's property has to be sacrificed so that community welfare may be served, and where the owner does not directly benefit from the evil avoided . . . , the occasion is appropriate for the exercise of eminent domain." To substantially the same effect are *Forde* v. *Miami Beach,* 146 Fla. 676, 685, *Grosso* v. *Board of Adjustment of the Township of Millburn,* 137 N. J. L. 630, 632–634, *Arverne Bay Constr. Co.* v. *Thatcher,* 278 N. Y. 222, 230–231, *Miller* v. *Beaver Falls,* 368 Pa. 189, 194–198. Many of the cases cite or quote from the opinion of Mr. Justice Holmes in *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 415–416. "The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation. A similar assumption is made in the decisions upon the Fourteenth Amendment. . . . When this seemingly absolute protection is found to be

qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States. The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking . . . . We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change. As we already have said, this is a question of degree . . . ."

S. Volpe, the president, treasurer, and principal stockholder of the defendant, testified that the project he had in contemplation could not be carried out without filling the marsh as he proposed; that if the marsh were not to be filled no use, residential or commercial, could be made of the area owned by the defendant; that there was no point to the dredging if he could not fill the area; and that unless he could dredge the channel and fill the portion owned by the defendant on Broad Marsh the land was of no value to him.

While we find without hesitation that the project was as testified by him, we are in no position also to find whether there has been such a deprivation of the practical uses of the marsh as to be the equivalent of a taking without compensation. A finding one way or the other on this issue is essential to a proper disposition of the case.

The plaintiffs argue as though all that need be done is to demonstrate a public purpose and then no regulation in the interests of conservation can be too extreme. We quote an example from their brief: "if the decision of the trial judge is not upheld in this case, where the evidence is so overwhelming that the marsh . . . does contribute substantially to the ecological system necessary to the sustenance of shellfish and fin fish, the statute will be emasculated and our efforts to conserve our natural resources will have received a severe setback." An unrecognized taking in the

guise of regulation is worse than confiscation. As the New York Court of Appeals said in the *Arverne* case, *supra,* 278 N. Y. 222, 232: "An ordinance which *permanently* so restricts the use of property that it cannot be used for any reasonable purpose goes, it is plain, beyond regulation, and must be recognized as a taking of the property. The only substantial difference, in such case, between restriction and actual taking, is that the restriction leaves the owner subject to the burden of payment of taxation, while outright confiscation would relieve him of that burden."

In this conflict between the ecological and the constitutional, it is plain that neither is to be consumed by the other. It is the duty of the department of conservation to look after the interests of the former, and it is the duty of the courts to stand guard over constitutional rights.

In summary, our views are that the finding that Broad Marsh is a "saltmarsh" necessary to preserve and protect marine fisheries is not plainly wrong; that, considered apart from the taking issue, the rulings that the prohibition of filling the marsh is a condition authorized by § 27A, and that § 27A is valid, are correct as upholding a valid public purpose; and that whether the defendant is the uncompensated victim of a taking invalid without compensation depends upon further findings as to what uses the marshland may still be put and possibly upon other issues which have not been argued and which are enumerated below.

The final decree is reversed. The case is remanded for the following purposes:

First, for the taking of further evidence and for further findings on the following matters:

1. The portions, if any, of the 49.4 acres (the locus) which the owner desires to improve below the line of mean high water (see *Commonwealth* v. *Roxbury,* 9 Gray, 451, 483).

2. The uses which can be made of the locus in its natural state (a) independently of other land of the owner in the area; (b) in conjunction with other land of the owner.

3.   The assessed value of the locus for each of the five years, 1960 to 1964, inclusive.

4.   The cost of the locus to the defendant.

5.   The present fair market value of the locus (a) subject to the limitations imposed by the Commissioner; (b) free of such limitations.

6.   The estimated cost of the improvements proposed by the defendant.

7.   Any relevant rules and regulations prescribed by the Director of Marine Fisheries.

8.   Any relevant by-laws (including zoning provisions) or regulations of the town of Wareham.

Second, for further hearings to develop any revelant evidence on each of the following issues, none of which has been argued and as to which we express no opinion.   Briefs and oral arguments should be directed at least to such issues upon any subsequent appeal to this court.

A.   Would the Commonwealth, by the imposition of the proposed restriction, take property without just compensation, if there is no substantial possible use of the locus while subject to the proposed restriction which will yield to the owner of the locus a fair return (1) upon the amount of his investment in the locus, or (2) upon what would be the fair market value of the locus free of the restriction?

B.   If it is contended that the land, if subject to the proposed restriction, may be profitably used in connection with other land, is this relevant, and, if so, to what extent?

C.   Is it relevant to question A or B that the locus is not suitable in its present state for residential or commercial use?

D.   Is it relevant to questions A and B that the proposed filling, at least in part, will change coastal marshland, subject at times to tidal flow into upland?

E.   What, if any, is the effect and relevance of the colonial ordinance on the case at bar and to what extent does the ordinance relate to matters other than navigation near and upon the locus?

*So ordered.*