Rockingham
No. 6904

HOWARD W. SIBSON & a.

v.

STATE OF NEW HAMPSHIRE

March 31, 1975

*Shaines, Madrigan & McEachern (Mr. Robert A. Shaines* orally) for the plaintiffs.

*Warren B. Rudman,* attorney general, and *Donald W. Stever, Jr.,* assistant attorney general (*Mr. Stever* orally), for the State.

GRIFFITH, J. The plaintiffs appealed to the superior court from a denial by a special board acting under the aegis of the water resources board of a permit to fill approximately four acres of salt marshland in Rye. Laws 1969, 387:6; Laws 1971, 329:1; RSA 483-A:4 (Supp. 1973). The appeal was heard by *Blandin,* judicial referee, whose report dismissing the appeal was approved by *Morris,* J., who reserved and transferred plaintiffs' exceptions.

The critical question to be determined is whether the trial court erred when it concluded that the denial by the special board of the permit to fill the saltmarsh was a valid exercise of the police power not requiring compensation. After examining the record and the findings of the judicial referee, we sustain the ruling of the trial court.

In 1968, plaintiffs purchased a six-acre tract of saltmarsh for $18,500. This was part of Awcomin Marsh, a tidal wetland approximately 100 acres in size. Following our decision in *Sibson v. State,* 110 N.H. 8, 259 A.2d 397 (1969), holding that the then language of RSA ch. 483-A did not apply to plaintiffs' land, the plaintiffs legally filled a two-acre portion of the saltmarsh without a permit. In 1972, the plaintiffs sold the filled land with a house they had built on it for $75,000, placing a value of $50,000 on the house and $25,000 on the land. The definition of marsh-

land added by Laws 1970, 22:1 now RSA 483-A:1-a (Supp. 1973) clearly includes plaintiffs' land. The litigation which culminated in *Sibson v. State*, 111 N.H. 305, 282 A.2d 664 (1971), although related has no particular relevance to the present case.

In sustaining the denial of a permit to fill by the special board, the judicial referee made extensive findings of fact and rulings of law. In part the findings concluded that plaintiffs' four acres were part of a valuable ecological asset of the seacoast area and that the proposed fill "would do irreparable damage to an already dangerously diminished and irreplaceable natural asset." In addition, the filling of land so close to the bridge under which a large flow of water daily came in and flowed out would "magnify the deleterious effect which the fill would have upon the entire one hundred acres of the marsh." The judicial referee also found "[t]he unfilled portion of the marsh is of practically no pecuniary value to the plaintiffs."

Controlling and restricting the filling of wetlands is clearly within the scope of the police power of the State. The evidence in the case overwhelmingly supported the referee's findings on the importance of preserving saltmarshes "as one of the most productive areas of nutrient per acre to be found anywhere." The evidence further supported the referee's finding that the proposed fill would be "bad for the marsh" and "for mankind". RSA 483-A:1-b (Supp. 1973) sets forth in some detail the harm that results from unregulated filling of wetlands and the contributions of wetlands to mankind in support of the legislative finding that it is "for the public good and welfare of this state to protect and preserve its submerged lands under tidal and fresh waters and its wetlands (both saltwater and freshwater, as herein defined) from despoliation and unregulated alteration." *See* 5 Fish & Wildlife Service, U.S. Dep't of the Interior, National Estuary Study 66-71 (1970); Note, *Estuarine Pollution: The Deterioration of the Oyster Industry in North Carolina*, 49 N.C.L. Rev. 921 (1971); Binder, *Taking Versus Reasonable Regulation: A Reappraisal In Light of Regional Planning and Wetlands*, 25 U. of Fla. L. Rev. 1, 18-30 (1972).

The plaintiffs do not seriously contest that the denial of the permit to fill was a proper exercise of the police power, but argue that this denial rendered their saltmarsh economically useless and therefore constitutes a taking. They rely upon a theory first promulgated by Justice Holmes in *Pennsylvania*

*Coal Co. v. Mahon,* 260 U.S. 393 (1922), that compensation is due a landholder when a regulation destroys all or substantially all of the value of the property affected or denies to the owners all of its beneficial use. When such a destruction or diminution occurs, there is a taking of private property for public use without compensation in violation of State and Federal Constitutions. U.S. CONST. amend. V; N.H. CONST. pt. I, art. 12; *see Surry v. Starkey,* 115 N.H. 31, 332 A.2d 172 (1975); *Carter v. Derry,* 113 N.H. 1, 4, 300 A.2d 53, 55 (1973). Based upon this principle governmental attempts to prevent filling of marshlands have been denied or restricted in some jurisdictions. *E.g., State v. Johnson,* 265 A.2d 711 (Me. 1970); *Commissioner of Natural Resources v. S. Volpe & Co.,* 349 Mass. 104, 206 N.E.2d 666 (1965); *Dooley v. Town Plan & Zoning Comm'n,* 151 Conn. 304, 197 A.2d 770 (1964); *Morris County Land I. Co. v. Parsippany-Troy Hills Tp.,* 40 N.J. 539, 193 A.2d 232 (1963).

The referee found that the plaintiffs had recovered their total investment and made some profit. Since they had been able to fill two acres and build a house on their original six-acre tract, the dismissal of their appeal could be sustained on the basis that their land was not rendered useless, but that they had only been deprived of a speculative profit. *See Steel Hill Dev., Inc. v. Town of Sanbornton,* 469 F.2d 956 (1st Cir. 1972). We prefer to decide the case on the present application to fill the four acres still retained by the plaintiffs.

Counsel for the State urges with some force that we reject the Holmes formula as imprecise and unsuited to the problems involved in the preservation of wetlands. It is conceded that the rule is imprecise and difficult to apply. "There is no set formula to determine where regulation ends and taking begins. Although a comparison of values before and after is relevant, . . . it is by no means conclusive, see *Hadachek v. Sebastian . . .* [239 U.S. 394 (1915) ], where a diminution in value from $800,000 to $60,000 was upheld." *Goldblatt v. Hempstead,* 369 U.S. 590, 594 (1962). *Compare Turnpike Realty Co. v. Town of Dedham,* 284 N.E.2d 891 (Mass. 1972) *with Dooley v. Town Plan & Zoning Comm'n,* 151 Conn. 304, 197 A.2d 770 (1964).

A different approach is suggested to determine whether a land use statute and subsequent regulatory activity are constitutional or confiscatory. Under the proposed rule, if the action of the State is a valid exercise of the police power proscribing activities that could harm the public, then there is no taking under the

eminent domain clause. It is only when the state action appropriates property for the public use at the expense of the property owner that compensation is due. Stever, *Land Use Controls, Takings And The Police Power – A Discussion Of The Myth*, 15 N.H.B.J. 149 (1974); Sax, *Takings, Private Property and Public Rights*, 81 Yale L.J. 149 (1971); Sax, *Takings and the Police Power*, 74 Yale L.J. 36 (1964).

This rule finds support in cases apparently ignored in the cases purporting to follow the rule of *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922). In *Mugler v. Kansas*, 123 U.S. 623 (1887), the Court upheld the shutting down without compensation of a brewery by the Kansas prohibition law and in *State v. Griffin*, 69 N.H. 1, 39 A. 260 (1896), a statute was sustained that required the defendant to cease dumping sawdust in a public water supply. In *State v. Griffin, supra* at 23-24, 39 A. at 260-61, the court quoted from an opinion by Chief Justice Shaw in *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53, 85-86 (1851):

"Rights of property, ... are subject to such reasonable limitations in their enjoyment as shall prevent them from being injurious, and to such reasonable restraints and regulations established by law as the legislature ... may think necessary and expedient."

"This is very different from the right of eminent domain, the right of a government to take and appropriate private property to public use whenever the public exigency requires it, which can be done only on condition of providing a reasonable compensation therefor. The power we allude to is rather the police power...."

" ....

" .... It is not an appropriation of the property to a public use, but the restraint of an injurious private use by the owner, and is therefore not within the principle of property taken under the right of eminent domain."

In zoning cases, there has been some erosion of the Holmes principle in dealing with the restraint or elimination of nonconforming uses. In *Flanagan v. Hollis*, 112 N.H. 222, 293 A.2d 328 (1972), we sustained substantial restrictions upon the enlargement of existing gravel excavations, but in *Surry v. Starkey*, 115 N.H. 31, 332 A.2d 172 (1975), we refused to uphold an immediate termination of use of land as a gravel bank where the trial court found that practically the only use of land was a gravel bank. " [T]here is no public taking, unless the prohibition de-

prives the owner of the only use of his land" *(Flanagan v. Hollis, supra* at 223, 293 A.2d at 329), and in any event there is "no absolute right to continue a nonconforming use to eternity." *Id.* at 225, 293 A.2d at 330; *Lachapelle v. Goffstown,* 107 N.H. 485, 225 A.2d 624 (1967). We are not disposed to extend the absolute of the *Griffin* case rule to zoning cases dealing with legitimate current uses which are the only uses of the property. The approach we have taken is a legitimate method of lessening the burden on the individual of the action taken for the public good.

Somewhat more analogous to the present cases are cases where individuals are required to cease heretofore lawful activities now determined harmful to the public. These cases generally involve state action thought to be required to protect the health, welfare and morals of the public or required by an emergency. The validity of the state action is determined by balancing the "importance of the public benefit which is sought to be promoted against the seriousness of the restriction of a private right sought to be imposed." *Richardson v. Beattie,* 98 N.H. 71, 75-76, 95 A.2d 122, 125 (1953). The state action is sustained in these cases unless the public interest is so clearly of minor importance as to make the restriction of individual rights unreasonable. *Shirley v. Commission,* 100 N.H. 294, 124 A.2d 189 (1956); *Dederick v. Smith,* 88 N.H. 63, 184 A. 595 (1936); *Woolf v. Fuller,* 87 N.H. 64, 174 A. 193 (1934); Annot., 32 A.L.R.3d 215, 250-55 (1970). The importance of wetlands to the public health and welfare would clearly sustain the denial of the permit to fill plaintiffs' marshland even were their rights the substantial property rights inherent in a current use of an activity on their land.

Moreover, the rights of the plaintiffs in this case do not have the substantial character of a current use. The denial of the permit by the board did not depreciate the value of the marshland or cause it to become "of practically no pecuniary value." Its value was the same after denial of the permit as before and it remained as it had been for milleniums. The referee correctly found that the action of the board denied plaintiffs none of the normal traditional uses of the marshland including wildlife observation, hunting, haying of marshgrass, clam and shellfish harvesting, and aesthetic purposes. The board has not denied plaintiffs' current uses of their marsh but prevented a major change in the marsh that plaintiffs seek to make for speculative profit. "An owner of land has no absolute and unlimited right to change the essential natural character of his land so as to use it for a

purpose for which it was unsuited in its natural state and which injures the rights of others." *Just v. Marinette County,* 56 Wis. 2d 7, 17, 201 N.W.2d 761, 768 (1972); *Candlestick Prop. Inc. v. San Francisco Bay C. & D. Com.,* 11 Cal. App. 3d 557, 89 Cal. Rptr. 897 (1970); Waite, *Ransoming the Maine Environment,* 23 Maine L. Rev. 103, 117 (1971).

We hold that the denial of the permit to fill the saltmarsh of the plaintiffs was a valid exercise of the police power proscribing future activities that would be harmful to the public and that, therefore, there was no taking under the eminent domain clause. *State v. Griffin,* 69 N.H. 1, 39 A. 260 (1896); *Mugler v. Kansas,* 123 U.S. 623 (1887). In view of the result reached, we have not deemed it necessary to consider the servitude in favor of the State imposed on the rights of littoral owners on public waters (*See Sibson v. State,* 110 N.H. 8, 10, 259 A.2d 397, 400 (1969)), nor the State's claim of ownership of the saltmarsh.

*Plaintiffs' exceptions overruled; appeal dismissed.*

GRIMES, J., concurred in the result in part and dissented in part; the others concurred.

GRIMES, J., concurring in the result in part and dissenting in part:

I am in complete sympathy with those who wish to preserve the marshes. However, I continue to agree with Judge Smith when over one hundred years ago he said that great public benefit "may afford an excellent reason for taking the plaintiff's land in a constitutional manner but not for taking it without compensation." *Eaton v. B.C. & M. R.R.,* 51 N.H. 504, 518 (1872); *Ferguson v. Keene,* 108 N.H. 409, 415, 238 A.2d 1, 5 (1968) (dissenting opinion).

Because I fear this decision destroys private ownership in all undeveloped property in this State, I can concur in the result only as to that part of the marsh which lies below the mean high water mark of the Atlantic Ocean. I can concur to this extent because the State has an interest in the public waters which would be reduced by the fill.

The master has found that the unfilled marsh is of practically no pecuniary value to the plaintiffs. As to the marsh above mean high water, the effect of the State's action is to compel the plaintiff to devote his land to a public purpose without compensa-

tion by denying him the right to put it to any other reasonably profitable use.

This constitutes a taking. *Surry v. Starkey,* 115 N.H. 31, 332 A.2d 172 (1975); *Eaton v. B.C. & M. R.R.,* 51 N.H. 504 (1872); *State v. Johnson,* 265 A.2d 711 (Maine 1970). The effect of the principle adopted in today's decision is to undermine a great constitutional safeguard.