BRUCE MACGIBBON & another *vs.* BOARD OF APPEALS
OF DUXBURY.

Plymouth.   October 7, 1975. — January 9, 1976.

Present:   TAURO, C.J., REARDON, QUIRICO, BRAUCHER, HENNESSEY,
KAPLAN, & WILKINS, JJ.

*Zoning,* Special permit; Wetlands; Board of appeals: decision.  *Sea-
shore.*

Discussion of the scope of judicial review applicable to decisions of
zoning boards of appeals with respect to special permits under zoning
ordinances or by-laws. [515-516]

Where a zoning by-law of a town required a special permit from the
board of appeals to excavate or fill any marsh, the board's denial of a
permit on the ground that the owners had failed to show that their
proposal could provide sanitary sewage disposal was based on a legally
untenable ground since that ground was relevant only to the propriety
of subsequent permits and not to the permit being sought. [516]

The preservation of privately owned coastal wetlands in their natural
state for the protection of the ocean food chain and other public bene-
fits by preventing owners from filling them was not within the scope of
authority delegated to towns under The Zoning Enabling Act, G. L.
c. 40A, and did not provide a legally tenable ground for denying a
permit to excavate and fill the land. [516-518]

The risk of flooding and erosion was not legally tenable ground for denial
of a special permit under a zoning by-law to excavate and fill privately
owned coastal wetlands, where the board of appeals could have re-
solved the problem instead by granting the permit subject to appropri-
ate conditions and safeguards. [518-520] REARDON, J., with whom
WILKINS, J., joins, dissenting.

Where an application to a town's board of appeals for a special permit
under the zoning by-law had been pending for thirteen years and had
been denied by the board three times on grounds held to be legally un-
tenable, this court ordered the entry of a judgment directing the board
to issue the permit within ninety days, subject to appropriate condi-
tions and safeguards. [520]

BILL IN EQUITY filed in the Superior Court on October
30, 1973.

The suit was heard by *Hallisey*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Bruce MacGibbon* for the plaintiffs.

*Donald L. Connors*, Town Counsel, for the Board of Appeals of Duxbury.

BRAUCHER, J.   The plaintiffs appeal for the third time from a denial by the board of appeals (board) of the town of Duxbury (town) of a special permit to excavate and fill certain portions of their coastal marshland. *MacGibbon* v. *Board of Appeals of Duxbury*, 347 Mass. 690 (1964) (*MacGibbon I*). *MacGibbon* v. *Board of Appeals of Duxbury*, 356 Mass. 635 (1970) (*MacGibbon II*).   For the third time we hold that the decision of the board must be annulled.   This time the board is to be directed to grant the permit applied for, subject to appropriate conditions and safeguards to be specified by the board for the sole purpose of substantially decreasing erosion of the fill and adjoining land.

In 1960 the town amended its zoning by-law by adding the following provision:   "[The by-law] is also for the purpose of protecting and preserving from despoliation the natural features and resources of the town, such as salt marshes, wetlands, brooks and ponds.   No obstruction of streams or tidal rivers and no excavation or filling of any marsh, wetland or bog shall be done without proper authorization by a special permit issued by the Board of Appeals."   Section 8(d) of the by-law provided: "The Board of Appeals may, in appropriate cases and subject to appropriate conditions and safeguards, make special exceptions to the terms of the by-law in harmony with their general purpose and intent, and in accordance with the specified rules contained in this by-law."[1]

---

[1] In 1971 this became § 9(d).   The 1971 amendments established a Wetland and Watershed Protection District.   The parties have stipu-

In 1961 the plaintiffs acquired some seven acres of tidal marsh for $1,000. The judge found that the bulk of the plaintiffs' land is at or just barely above mean high water. In 1962 they applied for a special permit "to fill and/or excavate" their land. The permit was denied on the ground that the land was unsuitable for residential construction or for the installation of cesspools and septic tanks. In *MacGibbon I* we ordered that the board's decision be annulled on the ground that the plaintiffs were seeking a permit to fill or excavate, not a building permit, and that the board's reasons seemed relevant primarily to residential use. 347 Mass. at 692.

The plaintiffs then limited their application to a portion of their land, comprising four lots of about 10,000 square feet each, and in 1966 the board again denied their application, this time on the ground that permits were not intended to be used on marshland on the waterfront. In *MacGibbon II* we again ordered that the board's decision be annulled. We ruled: (1) There had been no compliance with our directive in *MacGibbon I* that "'. . . the facts relevant to the denial of the plaintiffs' petition *to excavate and fill* must be stated.'" 356 Mass. at 639. (2) The board erred in interpreting the by-law to exclude coastal wetlands from the provision for special permits. *Id.* at 639-640. (3) "The preservation of privately owned land in its natural, unspoiled state for the enjoyment and benefit of the public by preventing the owner from using it for any practical purpose is not within the scope and limits of any power or authority delegated to municipalities under the Zoning Enabling Act." *Id.* at 640-641.

The board held a third hearing on September 24, 1973, and again denied the application. On appeal, a judge of the Superior Court ruled that the board's decision was not "shown to be based on a legally untenable ground, nor was its exercise of discretion shown to be unreasona-

lated that the plaintiffs' application was subject to the by-law as it existed before the 1971 amendments.

ble, whimsical, arbitrary, capricious, nor based on pre-
texts or veils for reasons not related to proper purposes."
From a judgment dismissing the plaintiffs' petition, they
appealed. A single justice of the Appeals Court allowed
the plaintiffs' motion to prosecute the appeal in forma
pauperis, and we ordered direct review by this court on
our own initiative pursuant to G. L. c. 211A, § 10 (A).

The judge found that the plaintiffs' proposal was to
excavate and fill the four lots "and to install a sewage
system." He then made a number of findings leading to
the conclusion that they had failed to sustain their burden
of proving that their proposal could provide proper sani-
tary sewage disposal. He made further findings con-
cerning the role of coastal marsh in the ocean food chain
and the practical uses to which the property can be put
without a permit. Finally, he made findings as to the
flooding and erosion of the plaintiffs' lands and adjoining
lands. We consider separately (1) the scope of review,
(2) sewage, (3) the ocean food chain, (4) flooding and
erosion, (5) costs, and (6) disposition of the case.

1. *The scope of review.* We adhere to our decision in
*MacGibbon II* that the standards for the guidance of the
board are adequate, that the board has discretionary
power in acting on the permit, and that its decision can-
not be disturbed unless it is based on a legally untenable
ground, or is unreasonable, whimsical, capricious or arbi-
trary. 356 Mass. at 638-639. In general, refusal to
grant a special permit does not require detailed findings
by the board. *Brockton Pub. Mkt. Inc.* v. *Board of Ap-
peals of Sharon,* 357 Mass. 783 (1970). But we stand by
our decision in *MacGibbon I,* reaffirmed in *MacGib-
bon II,* that "before we can pass on the validity of the
board's action, the facts relevant to the denial of the
plaintiffs' petition *to excavate and fill* must be stated."
347 Mass. at 692, 356 Mass. at 639. Cf. *Josephs* v.
*Board of Appeals of Brookline,* 362 Mass. 290, 294-295
(1972); *Vazza Properties, Inc.* v. *City Council of Wo-*

*burn,* 1 Mass. App. Ct. 308, 312 (1973). "All the evidence before the judge is before us, including, as exhibits, photographs of the locus and the decisions of the board. In these circumstances, 'all questions of law, fact, and discretion are open for review by us and we can make findings in addition to those made by the trial judge, but we do not disturb his findings of fact unless they appear to be plainly wrong.' *Rodenstein* v. *Board of Appeal of Boston,* 337 Mass. 333, 334." *Broderick* v. *Board of Appeal of Boston,* 361 Mass. 472, 477 (1972). *Murphy* v. *Zoning Board of Appeals of Lawrence,* 2 Mass. App. Ct. 876 (1974).

2. *Sewage.* In *MacGibbon I,* we held: "In so far as the permit is sought for the purpose of filling and excavating land, it ought not to be denied on the basis that the land is unsuitable for residential construction or for the installation of cesspools and septic tanks." 347 Mass. at 692. As the plaintiffs point out, even if a permit to excavate and fill is granted, they will still have the burden of convincing other appropriate authorities that subsequent permits for building and sewage should be issued. Denial of the first permit on a ground relevant only to the subsequent permits was therefore a denial based on a legally untenable ground.

3. *The ocean food chain.* The judge found that salt water marshes like the plaintiffs' are "important links in the ocean food chain" and that they remove certain poisons from coastal waters. He also found that the board has granted permits to others to fill and make improvements on wetlands, ignoring the board's concession that there were no permits which indicated permission to fill wetlands, and he concluded that the denial was "not solely to preserve the area in its natural state for the enjoyment of the public." He further found that the plaintiffs' marshland could be used for agriculture and recreation and had possibilities for construction of a marine railway and other uses, that it had a fair market value of $5,300, and that if single residences could

be built on it with sanitary sewer facilities and access it would have a value of $44,000. He ruled that the plaintiffs' property "is a natural feature and resource" of the town, that there are practical uses which the plaintiffs can make of the location, and that the denial of the permit was not tantamount to a taking without compensation.

We have recognized that the protection of marine fisheries and the preservation of coastal wetlands are proper public purposes. *Golden* v. *Selectmen of Falmouth,* 358 Mass. 519, 523 (1970). *Commissioner of Natural Resources* v. *S. Volpe & Co.,* 349 Mass. 104, 107 (1965). Cf. *Opinion of the Justices,* 365 Mass. 681, 687-690 (1974). In *MacGibbon II* we indicated several alternative ways by which the town may lawfully accomplish a purpose of preserving its remaining undeveloped coastal wetlands in their natural, unspoiled condition for the enjoyment and benefit of the public. 356 Mass. at 641-642 & n.3. The lawful alternatives did not include exercising the power to regulate under the zoning by-law "in such a manner and to such an extent that it deprives the plaintiffs' land of all practical value to them or to anyone acquiring it, leaving them only with the burden of paying taxes on it." *Id.* at 641. Cf. *Commissioner of Natural Resources* v. *S. Volpe & Co.,* 349 Mass. 104, 107-111 (1965); *Aronson* v. *Sharon,* 346 Mass. 598, 603-604 (1964).

We accept the judge's finding that the board's denial of the permit was not solely to preserve the area in its natural state, but we think his conclusion that there are practical uses to which the property can be put misconceives the applicable standard. The possible uses found, for agriculture and recreation, do not appear to be "practical" in the sense used in *MacGibbon II.* As one of the board's experts testified, "the uses to which the property may be put include — and some of these may sound facetious, but they're not — bird watching, hiking — these are actual uses that people have, do make of such

properties, similar properties — looking at the water,
. . . just simple pride of ownership, just to say that they
own a piece of the salt marsh, flying model airplanes or
kites, growing marsh hay, which at one time was a very
strong use of marsh, very prevalent use I should say, to
protect the view, to provide a view. . . . Of course, one,
obviously, is conservation. . . ."

We conclude that the preservation of the ocean food
chain and other public benefits of the land in its natural
state did not provide a legally tenable ground for denying
the permit, at least where the land in question is at or
above mean high water. As to the significance of the
mean high water line, see *Opinion of the Justices*, 365
Mass. 681, 684-685 (1974), and authorities cited.

4. *Flooding and erosion.* The judge found that the
plaintiffs' proposal was to excavate and fill the four lots
to a height about four feet above mean high water level,
and that, so filled, the marsh would be covered at high
water during extreme high tides, which occur at least
annually, and when strong southwest winds coincide with
ordinary high tides, a combination which occurs fre-
quently. He further found that marsh grasses dampen
the wave action caused by the wind and consequently
retard erosion of the adjoining banks, and that the pre-
vention of erosion was a proper factor to consider. He
ruled that there was a substantial relationship between
the public health and erosion considerations found both
by the court and by the board and the exercise of the
board's discretion against the plaintiffs.

If flooding and erosion provided a legally tenable
ground for denying the permit, the board's decision to
deny it would not be invalid merely because in exercising
its discretion the board took into account public health
and other considerations, even though those considera-
tions would not of themselves furnish a legally tenable
ground for denial. Cf. *Turnpike Realty Co.* v. *Dedham*,
362 Mass. 221, 229 (1972). But if flooding and erosion
do not furnish a legally tenable ground, we do not think

other considerations, insufficient in themselves, can supply the deficiency. We therefore consider separately the sufficiency of flooding and erosion with respect to land at or above mean high water.

The board relies heavily on *Turnpike Realty Co.* v. *Dedham, supra,* where we upheld a by-law regulating filling and building in a flood plain district. We identified "three basic public policy objectives of restricting use of flood plains . . .: (1) the protection of individuals who might choose, despite the flood dangers, to develop or occupy land on a flood plain; (2) the protection of other landowners from damages resulting from the development of a flood plain and the consequent obstruction of the flood flow; (3) the protection of the entire community from individual choices of land use which require subsequent public expenditures for public works and disaster relief." *Id.* at 228.

Those objectives have less force here. First, we are not concerned with a building permit, and so need not consider the protection of the developer or occupant of a residence subject to flooding, or the avoidance of expenditures for public works and disaster relief. Second, obstruction of coastal tidewater at or above mean high water is very different from obstruction of a river; there is less certainty that water diverted from the developer's land will flow over the land of others. Nevertheless, we think the board was entitled to consider flooding and resulting erosion in passing on the permit.

The board's witness who testified to the prospective flooding of the land after filling also testified that wooden planks would substantially decrease or eliminate erosion of the fill, and that, if the level of fill were higher, flooding could be prevented even in the event of once-a-year storms. We think a finding is required that the prospective erosion of the fill and of adjoining upland could be decreased to an acceptable level by appropriate conditions and safeguards. The board has power to order such conditions and safeguards. G. L. c. 40A,

§ 4. *Shuman* v. *Aldermen of Newton,* 361 Mass. 758, 766 (1972). *Shoppers' World, Inc.* v. *Beacon Terrace Realty, Inc.,* 353 Mass. 63, 70 (1967). But the board's decision explicitly rejects "any grant of an exception." The danger of flooding and erosion was therefore not a legally tenable ground for outright denial of the permit. The problem should have been resolved by conditions and safeguards, and it is to be so resolved.

5. *Costs.* The plaintiffs argue that they should recover costs. Under G. L. c. 40A, § 21, costs are not allowed unless it appears that the board "acted with gross negligence, in bad faith or with malice." No such finding was made in the Superior Court, and the record before us does not require such a finding. Cf. *Salah* v. *Board of Appeals of Canton,* 2 Mass. App. Ct. 488, 497 (1974).

6. *Disposition.* Under G. L. c. 40A, § 21, the Superior Court may annul the board's decision if it exceeds the board's authority, "or make such other judgment as justice and equity may require." "The circumstances in which a court may resolve a controversy such as the present one by ordering a board of appeals to issue a special permit or grant a variance are extremely narrow." *Roberts-Haverhill Associates* v. *City Council of Haverhill,* 2 Mass. App. Ct. 715, 717 (1974), and cases cited. In this case, however, in view of the thirteen years the plaintiffs' application has been pending, during which the board has denied it three times on legally untenable grounds, justice and equity would not be served by a third remand to consider whether a permit is to issue. The judgment is reversed. A new judgment is to be entered annulling the board's decision and directing the board to issue the permit within ninety days after the entry of the new judgment, subject to appropriate conditions and safeguards to be specified by the board for the sole purpose of substantially decreasing erosion of the fill and adjoining land.

*So ordered.*

REARDON, J. (dissenting with whom Wilkins, J., joins).
I dissent. In my view this court is making a serious mistake in promulgating this opinion and the order which it contains. The marshlands of Massachusetts are an invaluable natural resource, and their acreage, which is limited, is subject to constant incursions which, it seems to me, with proper respect for property rights, we have an obligation to preserve not only for ourselves but for the generations to follow. The expert testimony before the trial judge gave ample support to this proposition. It would appear that the plaintiffs purchased seven acres of tidal salt marsh in 1961 for $1,000. At trial there was competent testimony that the current value of the property was $5,350. On March 12, 1960, prior to the purchase by the plaintiffs, the town signalled its intention to protect its wetlands by the amendment to the zoning by-law set out in the main opinion. We treated the plaintiffs' petition of September 27, 1962, to the board of appeals "[t]o fill and/or excavate" all or part of the seven acre tract in *MacGibbon I.* The case came back, and *MacGibbon II* was the result. The suggestion was there made that the town might preserve its wetlands by purchase, acquisition of easements, or takings by eminent domain.

Having had no part in *MacGibbon I* or *MacGibbon II,* this is the first opportunity which has been afforded to me to disagree with that proposition. It is my contention that basic to the problem which this case presents is a valid exercise for the public police power to restrain an injurious private use by the plaintiffs, a concept well stated by Chief Justice Shaw in *Commonwealth* v. *Alger,* 7 Cush. 53, 84-86 (1851), and recently embraced by the Supreme Court of New Hampshire in *Sibson* v. *State,* 115 N.H. 124 (1975), on March 31, 1975. In *Mac-Gibbon I* we took note of the town's position that "'[i]f promiscuous changes in the surface of the earth are permitted, the attendant risks to the public health and safety are obvious. . . .'" At 692. Reference also was

made to flooding dangers. It was then said that "[t]hese are essentially contentions of fact which, if adequately verified and found applicable to the plaintiffs' petition, may provide a reasonable basis for the denial of the permit."

In the present case, in careful findings, the judge has recited what happens when one tampers with a salt marsh, particularly when the tampering includes the installation of a leaching bed sanitary system. He cited also the function of marsh grasses on wave action and erosion. His findings were framed after a lengthy trial, and nowhere does the court's opinion conclude he was plainly wrong. The opinion does state that "a finding is required that the prospective erosion of the fill and of adjoining upland could be decreased to an acceptable level by appropriate conditions and safeguards." It further states that "[t]he danger of flooding and erosion was therefore not a legally tenable ground for outright denial of the permit." On this proposition I have two comments. First, why is the board's resolution of the erosion problem legally untenable because this court hearing the case initially might have resolved it differently? We told the board in *MacGibbon I* to go back and consider flooding and erosion. This it did and came up with findings which subsequently found the Superior Court in accord. Second, it is not improper to inquire how it is, sitting far from the locus and absent professional help, that we as an appeal court can arrive at our own conclusions on highly technical matters when at the same time we do not label the judge's findings as plainly wrong.

In short, the case is freighted with important implications far beyond the case itself, and what flows from it will return to haunt us.